# EXHIBIT A

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | |
|---|---|
| **NOTICE TO DEFENDANT:**<br>*(AVISO AL DEMANDADO):*<br>FACEBOOK, INC., a business entity; MARK ZUCKERBERG, an individual; and DOES 1 through 10, inclusive<br><br>**YOU ARE BEING SUED BY PLAINTIFF:**<br>*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*<br><br>ANDREW DAVID BAMFORTH, an individual | **FOR COURT USE ONLY**<br>*(SOLO PARA USO DE LA CORTE)*<br><br>Electronically<br>**FILED**<br>by Superior Court of California, County of San Mateo<br>ON   10/8/2020<br>By   **/s/ Wai Shan Lee**<br>**Deputy Clerk** |

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):* COUNTY OF SAN MATEO SUPERIOR COURT<br>Southern Branch Hall of Justice and Records<br>400 County Center, Redwood City, CA 94063 | **CASE NUMBER:** *(Número del Caso):*<br><br>**20-CIV-04375** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Andrew David Bamforth, 340 S Lemon Ave #3051, Walnut, CA 91789 Tel: 1-800-572-3982 Extension 1

| DATE:<br>*(Fecha)* | 10/8/2020 | Neal I. Taniguchi | Clerk, by<br>*(Secretario)* | /s/ Wai Shan Lee | , Deputy<br>*(Adjunto)* |
|---|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010).)*

**NOTICE TO THE PERSON SERVED:** You are served

| [SEAL] | |
|---|---|
| | 1. [ ] as an individual defendant.<br>2. [ ] as the person sued under the fictitious name of *(specify)*:<br>3. [X] on behalf of *(specify)*: Facebook, Inc., a business entity<br>under: [X] CCP 416.10 (corporation)　　　　[ ] CCP 416.60 (minor)<br>　　　　[ ] CCP 416.20 (defunct corporation)　[ ] CCP 416.70 (conservatee)<br>　　　　[ ] CCP 416.40 (association or partnership)　[ ] CCP 416.90 (authorized person)<br>　　　　[ ] other *(specify)*:<br>4. [ ] by personal delivery on *(date)* |

**Page 1 of 1**

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courts.ca.gov* |

1    ANDREW DAVID BAMFORTH
     340 S Lemon Ave #3051
2    Walnut, CA 91789
     Telephone: 1-800-572-3982 extension 1
3    legal@faceparty.com

4
     Plaintiff, IN PRO PER
5

**Electronically**
**FILED**
by Superior Court of California, County of San Mateo
ON        **10/8/2020**
By_____**/s/ Wai Shan Lee**_____
              **Deputy Clerk**

6                    **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

7                           **FOR THE COUNTY OF SAN MATEO**

8

| | |
|---|---|
| 9  ANDREW DAVID BAMFORTH, an individual, | **Case No.:**   20-CIV-04375 |
| 10 | **COMPLAINT FOR DAMAGES:** |
| 11            Plaintiff, | 1.  Promissory Fraud |
| | 2.  Concealment |
| 12 vs. | 3.  Rescission of Contract |
| | 4.  Intentional Misrepresentation – Fraud |
| 13 FACEBOOK, INC., a business entity; | 5.  Fraud in Contract Formation |
| MARK ZUCKERBERG, an individual; | 6.  Actionable Deceit |
| 14 and DOES 1 through 10, inclusive | 7.  Trademark Infringement |
| 15 | 8.  False Designation of Origin |
|            Defendants. | 9.  Trademark Dilution |
| 16 | 10. Common Law Trademark Infringement |
| 17 | 11. Promissory Estoppel |
| | 12. Negligent Infliction of Emotional Distress |
| 18 | 13. Unfair Business Practices |
| 19 | 14. Intentional Interference with Prospective Economic Advantage |
| 20 | 15. Unjust Enrichment |
| 21 | UNLIMITED ACTION |
| 22 | **DEMAND FOR JURY TRIAL** |
| 23 | Complaint filed: |
| 24 | Trial Date: none set |

25   Comes Now Plaintiff, ANDREW DAVID BAMFORTH, and alleges as follows:

26                                  **PARTIES**

27        1.    Plaintiff ANDREW DAVID BAMFORTH ("Plaintiff"), is an individual and a

28   citizen of the United Kingdom, resides in the United Kingdom and has a US address at 340 S

                                          1
                                     COMPLAINT

1    Lemon Ave #3051, Walnut, CA 91789.

2         2.    Plaintiff owns the website Faceparty ("Faceparty") including certain associated

3    intellectual property assets and registered trademarks. The Faceparty website is operated under

4    license by I Blame Television Ltd, a business entity based in the United Kingdom. Plaintiff also

5    owns certain residual assets of CIS Internet Ltd t/a Faceparty, a private limited company created

6    under the laws of the United Kingdom, now dissolved.

7         3.    On information and belief, Defendant FACEBOOK, INC. ("Facebook") is a

8    business entity, doing business in Menlo Park, County of San Mateo, State of California and

9    includes any predecessors in interest.

10        4.    On information and belief, Defendant MARK ZUCKERBERG ("Zuckerberg") is

11   an individual, doing business in Menlo Park, County of San Mateo, State of California.

12                          **JURISDICTION/VENUE**

13        5.    This Court has subject matter jurisdiction over this action, and venue in the court

14   is proper, because both named Defendants do business in this County. Further, aspects of this

15   dispute are premised on an Agreement with Defendant Facebook that includes a provision that

16   any disputes be resolved in the Courts of Northern California.

17        6.    This action asserts both state and federal trademark claims and this court has

18   concurrent jurisdiction over such claims.

19                   **BACKGROUND & GENERAL ALLEGATIONS**

20        7.    Plaintiff has a history of novel invention, including the creation of the world's

21   first social networking website, almost a decade before the creation of Facebook. Plaintiff's

22   website operated under a number of different names, before it settled on "Faceparty" in 2000.

23   Between 2000 and 2008, Faceparty was operated under license by CIS Internet Ltd. Plaintiff was

24   the sole owner, shareholder and operator of CIS Internet, Ltd. until it was dissolved and Plaintiff

25   is a successor in interest to all of its remaining assets.

26        8.    Before Facebook existed, Independent auditing body ABC reported that

27   Faceparty served 1.5 billion web pages per month. In 2005 independent data from Hitwise (who

28   monitored internet traffic) repeatedly reported Faceparty as the most popular online community

by page impression and as the 4th most visited website in the world, for the UK audience. In April 2005 Google's UK press office announced that "Faceparty" was the 5th most searched word of all words on Google.

9.      In 2006 Faceparty was awarded the prestigious Superbrand award on account of its leading, global and unique brand identity. A-List celebrities such as Justin Timberlake and Beyonce along with brands such as Coca Cola and Virgin hosted fan clubs on Faceparty and the Faceparty brand was well known by Internet users of the time.

10.      In 2000-2008 Faceparty was particularly popular in the United Kingdom and in 2006 circa 1 in 10 UK residents were Faceparty members.

11.      Faceparty was a key pioneer of the Internet today, from a social perspective. Faceparty was also the first social media app, which came pre-installed on Nokia handsets in the United Kingdom. Faceparty's messenger app predated Facebook's messenger app by several years.

12.      Faceparty was so unique and popular that as from 2001, dozens of copycat sites were created by competitors, who wanted to benefit from Plaintiff's invention. Many of these copycat websites would clone Faceparty's unique features (software-free instant messaging, friends list, photo sharing, face-time etc.) along with Faceparty's blue and white color scheme; The majority of these copycat websites would operate under similar names that caused confusion in the marketplace and in particular caused people to believe the copycat websites were official extensions of Faceparty. Many of these copycat websites began with the word "Face" (i.e. "Facemates", "Faceclub" etc.) and on information and belief, the names were deliberately selected to trade off the goodwill associated with the Faceparty trademark.

13.      The brand confusion between these other "Face" websites began to cause problems for Faceparty. For example, Faceparty would receive customer service emails intended for its competitors - and as such Faceparty registered its trademarks to protect the Faceparty brand in the UK and the USA (and other countries), including the trademark of the word "FACE" (which was registered in classes relevant to online communities) in both Europe and the UK and with pending registration in the United States;

14.     Plaintiff or its associated company were issued the following registrations;

a.   "Face" (word) in class 38 in Europe (including UK) Reg. No. 3852779.

b.   "Faceparty" (word) in Classes 25, 38, 41 in USA Reg. No. 3291100.

c.   "Faceparty" (word) in Classes 16, 25, 35, 38, 41 in UK Reg. No. 2383978.

d.   "Faceparty" (word logo) in Classes 16, 25, 38, 41 in UK Reg. Nos. 2364009 and 2330204.

e.   "FP" (word) in Classes 38, 41 in UK Reg. No. 2384299.

f.   "FP" (word) in Classes 35, 38, 41 in EU (incl. UK) Reg. No. 4282356.

g.   "Faceparty" (word) in Classes 16, 25, 35, 38, 41 in EU (incl. UK) Reg. No. 4279428.

h.   "Faceparty" (word logo) in Classes 25, 35, 38, 41 in EU (incl. UK) Reg. No. 3852647.

15.     Pending registrations included;

a.   "Face" (word) in Classes 16, 25, 35, 38, 41, 45 in USA

b.   "Faceparty" and "Face" marks in many other countries around the world, including Australia, Canada and Europe.

16.     Cease and Desist letters were sent to those infringing the Face and Faceparty marks; these letters had success in protecting the Faceparty brand and competitors would change their names as not to cause confusion.

17.     In 2004 Defendants Zuckerberg and Facebook created a website which was highly similar to Faceparty, and had a number of Faceparty's unique features, including Faceparty's blue and white color scheme and traded with the dominant word "Face"; The defendant's website is now widely known, trading under the name "Facebook".

18.     Plaintiff became aware of Facebook in August 2005 when Faceparty started to receive letters from people asking to cancel their Facebook accounts; sometimes these were letters from Faceparty customers who had mixed up the word "Faceparty" with "Facebook" and sometimes these were Facebook customers writing to the wrong company. Defendants were sent a Cease and Desist letter, asking them to change their name as not to include "Face", citing

1    Plaintiff's prior registered trademarks and pending applications.

2        19.    Defendant/s replied to the Cease and Desist letter and during the resulting

3    conversations Zuckerberg represented that Facebook was just a school project. Zuckerberg

4    pleaded to be allowed to keep his website's "Facebook" name, assuring that he would never

5    trade outside of schools. Plaintiff and Faceparty agreed to refrain from legal action and allowed

6    Defendant/s to continue to use the word "Face" in its name on strict condition that Defendants

7    would not trade outside of schools and the academic environment nor outside of the United

8    States.

9        20.    There were several reasons why Plaintiff and Faceparty agreed to forgo legal

10   action and allow Defendant to trade with the name "Face", including;

11       a.   Defendant Zuckerberg was a college student and the use of the mark was

12           represented to be limited to college students;

13       b.   Because it was a project for school, Defendants' website was not expected to

14           directly compete with Faceparty site;

15       c.   Since the Facebook site did not have funding it was not expected to be a serious

16           threat to Faceparty;

17       d.   The Faceparty website was focused on the United Kingdom, where the bulk of its

18           customers resided and where Defendants did not operate; and

19       e.   There had only been 3 or 4 instances of brand confusion at the time of the

20           discussions, which were manageable by Faceparty.

21       21.    In 2005 during the discussions with Zuckerberg, neither Plaintiff nor Faceparty

22   were aware that in the summer of 2004, venture capitalist Peter Thiel had made a $500,000 angel

23   investment in Facebook for 10.2% of the company. Contrary to Zuckerberg's representation

24   Facebook was by no means just a school project, and as such Zuckerberg intentionally deceived

25   Plaintiff and Faceparty.

26       22.    Between 2004 and 2006, the core difference between Faceparty and Facebook

27   was that Facebook was limited to people in universities. Should Facebook have traded outside of

28   universities, then there would have been little difference between the products. Essentially

1    Facebook's concept was a "Faceparty for Schools".

2         23.    Defendants initially honored their promise not to trade outside of

3    schools/universities and not to trade outside of the United States until they acquired much greater

4    investment form larger media companies. On information and belief, around October 2005,

5    Facebook broke its promise with Plaintiffs and allowed schools and universities throughout the

6    world to become members of Facebook and, on information and belief, around September 2006

7    Facebook allowed anyone to join Facebook, regardless as to whether they were a student or not.

8         24.    By late 2005, on information and belief, Defendants were already aware that

9    brand confusion was occurring between Faceparty and Facebook. With full knowledge of the

10   actual and likelihood of confusion, Defendants showed reckless disregard and launched their

11   product in the UK, despite Faceparty's registered trademarks.

12        25.    The decision to enter the UK market by Defendants was made intentionally and in

13   bad faith and with knowledge it would lead to confusion.

14        26.    Immediately upon Facebook's launch into the UK, Faceparty began to suffer

15   increased and significant brand confusion and received thousands of emails that confused

16   "Faceparty" with "Facebook".

17        27.    From 2006 onwards, a large and increasing number of people in the UK were

18   likely to confuse the Faceparty social networking site with the Facebook social networking site.

19        28.    In February 2006 and after Facebook launched its social networking services in

20   the UK, Faceparty engaged a law firm to write to Defendant Facebook to prevent them from

21   trading under the name "Facebook" and informed Defendant that legal action would be taken if

22   they continued to trade under the "Facebook" name. Faceparty also opposed certain pending

23   trademarks that Defendants has filed in the US Patent and Trademark Office and in the United

24   Kingdom.

25        29.    While today the social side of the Internet is dominated by a limited number of

26   corporations, it was formerly operated by bedroom hobbyists, communities and lifestyle

27   businesses with no corporate penetration at all within the social networking space. The

28   worldwide web was invented by British inventor Tim Berners-Lee and one of his core beliefs for

1   the network was that the web should be void of corporate control and instead it should belong to

2   everyone, as it did for several decades. As the Internet grew in popularity, many of the world's

3   largest media corporations recognized that this "new media" could replace their traditional

4   media; as such they sought to establish a presence on the Internet;

5        30.      While corporations had tried to enter the social networking marketplace, many of

6   them failed because the people using the Internet at that time were reluctant to engage with a

7   corporate product due to their loyalty to the concept of the Internet. Many loyal to Tim Berners-

8   Lee's vision of the Internet were disappointed by Zuckerberg's decision to commercialize the

9   world wide web; Zuckerberg's decision was seen as a betrayal of the Internet users, due to a

10  belief that the Internet was never Zuckerberg's to sell.

11       31.      In summer of 2006 a crowd of more than a hundred people gathered outside

12  Faceparty's premises in London, waving placards featuring the Faceparty logo which had been

13  adapted from a smiley face into an angry face. On information and belief, these protesters were

14  disgusted with Plaintiff as they believed Plaintiff had betrayed the community by "selling out"

15  and encouraged people to boycott the Faceparty website. Plaintiff had not sold-out, and on

16  information and belief, the protesters had mixed Faceparty up with Facebook;

17       32.      In 2006, Plaintiff's Faceparty was a not-for-profit lifestyle-business, run by a

18  group of 12 people on modest salaries; all profits from Faceparty were put back into the

19  community;

20       33.      When Plaintiff challenged the protesters, they would not explain their anger to

21  him. Instead they would swear or throw bottles. This marked the beginning of severe damage

22  caused by brand confusion. Both Plaintiff and Faceparty had been very popular until this point.

23       34.      Even though Faceparty cost several million dollars a year to run, it relied upon

24  volunteers, donations and "mate's rates" to self-fund and survive financially. Prior to Facebook's

25  entry into the market, Faceparty had always been stable financially; Because of its popularity

26  and because it was a not-for-profit, there was never a shortage of people willing to help. For

27  instance Dell routinely donated free servers; a supplier of event staging charged Plaintiff £200

28  for services when the corporate going rate was close to £10,000; volunteers would often give up

1    the odd day for free, as they knew all profits benefitted the community.

2        35.    After Facebook entered the UK market, he cost of operating Faceparty

3    significantly increased. Volunteers refused to help for free, the discounted rates Faceparty

4    received were no longer available. Despite a decade of stable trading, Plaintiff's organization

5    was suddenly placed into a situation where it began to struggle to survive financially. One

6    significant factor in the financial demise of Faceparty was that former supporters suddenly

7    stopped believing Faceparty was a not-for-profit and started to believe Faceparty and Plaintiff

8    were earning hundreds of millions of dollars – they were mixing Faceparty up with Facebook.

9        36.    Plaintiff was suddenly target to groupies, stalkers and opportunists. By means of

10   example;

11           a.   Plaintiff had met some new friends in his personal life. They took him out to

12               dinner and after eating, they presented a proposal asking for tens of millions of

13               [British pounds] of investment for a new entertainment venue. Plaintiff was

14               confused as he earned a salary similar to that of a teacher. Those seeking

15               investment had mixed Plaintiff up with Defendants;

16           b.   Plaintiff began to receive letters from strangers, including a marriage proposal

17               containing a brochure for a mansion valued in excess of $5,000,000 which the

18               woman had requested Plaintiff buy for her as their family home;

19           c.   Strangers would turn up at Plaintiff's mother's home, looking to secure financial

20               investment in their projects from Plaintiff;

21           d.   Plaintiff would begin to see the same faces turn up in different friend groups

22               without logical reason and it was clear that these people were trying to network

23               into Plaintiff's life. This affected Plaintiff so much that he stopped associating

24               with new people or any existing friends who engaged these "stalkers". Plaintiff

25               began to develop trust issues and a nervous tic. This was the beginning of

26               Plaintiff's mental health problems; Plaintiff was of good health before this.

27       37.    Faceparty was not just an online community – it also organized real life events

28   and festivals, including a 35,000-capacity annual event in London on a similar scale to the

Coachella festival in California of the time. This was a creatively driven, not-for-profit event that raised circa $500,000 per annum for human rights charities. This event was made possible due to partnerships with London's leading nightclubs, who would program tents and stages for free (supplying free sound systems, acts and DJs etc. along with marketing the event in their clubs). Because Plaintiff organized this event in exchange for no fee to himself and to raise funds for charity, the clubs had willingly helped for fun and charity and had done for many years. Despite no fall-outs and having supported Plaintiff previously, 12 of the 20 supporting clubs suddenly grouped together and pulled-out of the 2007 event, despite having already pledged their support; these 12 clubs demanded Plaintiff paid them a fee of £10,000 each or they would not only refuse to assist but would actively organize a boycott and encourage people not to attend; Plaintiff refused the demands. On information and belief, the reason the clubs had pulled out, was that they incorrectly thought that Plaintiff was earning tens of millions from projects which Plaintiff had claimed were not-for-profit in order to gain support. On further information and belief, these clubs believed Plaintiff was dishonest.  However, in reality Plaintiff had always acted in good faith. The clubs had mixed Plaintiff's income with Defendant's due to brand confusion. Plaintiff had become hated among allies and the popular festival was cancelled leaving Plaintiff's management company liable for significant debts associated with the festival.

38.   Many of Plaintiff's employees had left higher paid corporate jobs to work for Faceparty. On information and belief, they had worked for Faceparty at below market rates because Faceparty offered a great lifestyle and they knew Plaintiff could not currently afford to match their former corporate salaries. The same people also worked dozens of hours of unpaid overtime for the same reasons.

39.   Plaintiff ran Faceparty with an associate and friend Matthew Brindle ("Brindle"), who coworkers knew received the same salary as Plaintiff was compensated.

40.   In early-to-mid-2007, co-worker Nathan McKenna approached Plaintiff in a rage; McKenna was disgusted to "discover" that Plaintiff and Brindle had secretly been earning tens of millions a year, while "pretending" to be on a modest wage, in order to trick the rest of the team to work unpaid over-time and work for reduced pay. McKenna produced an ultimatum, whereby

1  he demanded Plaintiff would also pay him tens of millions a year, or he vowed to turn everyone

2  against Plaintiff and Brindle and destroy Plaintiff's business. This was first time Plaintiff's own

3  employees would mix Faceparty up with Facebook and on information and belief, such

4  confusion was based upon things they were hearing from their friends and family. McKenna

5  proceeded to execute his threats, encouraging Faceparty employees to refuse to work.

6      41.    As time went by, more people came to believe that Plaintiff and Brindle had

7  misrepresented their income to manipulate staff into lower salaries and unpaid overtime.

8      42.    Some of Plaintiff's disgruntled staff began looting company property: staff

9  misused company credit cards and Plaintiff's personal credit cards; staff abused expense

10  accounts.

11      43.    Around the same time, Plaintiff's father was diagnosed with cancer, and his only

12  hope of treatment was proton therapy, which is only available as a self-pay treatment. Plaintiff

13  had arranged to pay for this, but the money was stolen by disgruntled staff. This meant Plaintiff's

14  father could not have his treatment and he died as a result. This event resulted in the worsening

15  pf Plaintiff' mental health.

16      44.    By late 2007 and with his business faltering, Plaintiff was left with circa

17  £3,300,000 of debts and liabilities, much of which was the result of brand confusion. Plaintiff

18  was target of multiple assaults and death threats from creditors, which contributed to Plaintiff's

19  emotional distress and mental illness.

20      45.    A bank foreclosed on Plaintiff's home and took the remainder of his savings

21  towards debts.

22      46.    In March 2008 Plaintiff had a full nervous breakdown and was no longer able to

23  function cognitively. Brindle had a nervous breakdown near the same time and there was not

24  sufficient staff to operate the business on a day to day basis. Contributing factors for Plaintiff's

25  breakdown was the pressure of the financial situation combined with the failure to understand

26  why everyone close to him had turned against him. Plaintiff sought treatment in the Priory

27  Hospital where he was diagnosed with symptoms of depression, anxiety and Post Traumatic

28  Stress Disorder ("PTSD").

47.     Newspapers in the United Kingdom published stories about how Plaintiff had earned tens of millions, because they confused Faceparty with Facebook. One publication dated April 27, 2008 listed Plaintiff as one of the richest people in the world. The confusion, amplified by the newspapers and other media, caused wider confusion and confirmed people's false assumptions that Plaintiff was earning tens of millions per annum;

48.     Many of Plaintiff's friends lost trust in him and cut him out of their lives. This included Brindle who had also begun to mistrust Plaintiff due to his own trust issues and the mental health problems that he had developed.

49.     A further factor that contributed to Plaintiff's mental health decline was the mental health and physical health of his former business partner and friend, Brindle. Brindle went on to suffer a stroke, which on information and belief was caused by the stress of the situation. Brindle was later diagnosed with severe PTSD which rendered him unable to work, and eventually resulted in him being made homeless.

50.     In 2008 Plaintiff suffered from auditory hallucinations in the form of multiple, simultaneous "machine-gun-like" intrusive voices that he could neither escape from nor "turn-off". Plaintiff lost ability to speak coherently and was arrested on three occasions due to his rapid incoherent ranting; Plaintiff's attempts to communicate while jumbling his words made people scared.

51.     During the period of his mental disability from 2006 through 2018 Plaintiff was repeatedly conned and people took advantage of Plaintiff's mental breakdown.

52.     In June 2008, during Plaintiff's ill-health, and despite Faceparty having legal representation Defendant's in-house attorney Jim Midgal ("Midgal") bypassed Plaintiff's attorney and approached Plaintiff directly in relation to the legal proceedings Faceparty intended to bring against Defendants for breaching Defendants' 2005 promise not to trade in the UK and for breaching and diluting Faceparty's and Plaintiff's registered trademarks.

53.     When Midgal contacted Plaintiff, Plaintiff was a day patient at The Priory mental hospital and of a mental state where he could not properly process thoughts. Plaintiff was so confused in his thought process and so unsure of his own mind, that he would frequently believe

things that he was told, even if they would be obviously nonsensical to someone of sound mind. In the summer of 2008 Plaintiff lacked capacity to make sound decisions and was unable to determine differences between friends and people out to exploit him.

54.    Midgal spoke to Plaintiff and told him that Facebook had not breached the 2004 promise and coerced Plaintiff into thinking it was impossible for him to win a trademark infringement case against Facebook.

55.    Midgal also told Plaintiff that he had not created the first social network nor any of its features. Plaintiff was so ill that he believed Midgal.

56.    Midgal claimed that he was acting in Plaintiff's best interests, and if Plaintiff didn't accept the offer, Defendants would cause him extreme financial damage, through running up legal fees and making Plaintiff pay for them.

57.    Migdal's representation were false and Plaintiff relied upon these representations when he considered Facebook's settlement terms.

58.    Midgal proposed that Facebook pay a sum of $800,000 in settlement of all claims and for Faceparty to transfer the "FACE" trademark to Defendants and for an Agreement that would permit Facebook to trade under its name unimpeded worldwide;

59.    The money offered was not sufficient to compensate Plaintiff for the damages caused by the brand confusion. However, due to his illness Plaintiff believed Migdal's false claims.

60.    Terrified of the additional financial damage that Midgal had promised and because he was coerced into believing he had no choice, Plaintiff signed an assignment and an agreement with Facebook on or around July 4, 2008 (the "2008 Agreement"); Migdal also prepared correspondence dated July 4, 2008 (the "Letter") relating to Plaintiff's personal interest in the Faceparty and Face trademarks, and told Plaintiff to print it on his letter-head paper, which he also signed.

61.    The 2008 Agreement is governed by California law.

62.    Plaintiff did not understand or comprehend what he was doing at the time he entered the 2008 Agreement. For example;

a.  The Letter dated July 4, 2008 states Plaintiff has no personal rights in the trademarks, that full rights were in CIS Internet Ltd (the company who operated the website under license from Plaintiff at the time) and that there were no other owners or persons with entitlement to the trademarks. This was not accurate. On the date of July 4, 2008, Plaintiff did not have capacity to understand the letter;

b.  As further example, on the date of the 2008 Agreement, Plaintiff's management company CIS Internet Ltd (a party to the agreement and the nominal owner and/or licensee of certain trademark registrations, was insolvent. Consequently, Plaintiff would not have been able to benefit from the contemplated payment of $800,000; Instead, all funds received would go to the British government. Plaintiff did not and could not have benefited from any compensation paid by Facebook under the 2008 Agreement. The 2008 Agreement had no value as it would have dispensed with the Face Trademark assets, and infringement claims for no consideration.

63.  CIS Internet Ltd. was subsequently dissolved and any remaining assets of the company, including the trademark rights, were vested in Plaintiff, who owned 100% of CIS Internet Ltd.

64.  From 2000-2006, the Faceparty website was by far a more popular product than Facebook in the United Kingdom. When Facebook entered the UK market, it took UK market share because Faceparty was knocked out-of-action by brand confusion, which Defendants' knew or should have known was a likely result of entering the UK market.

65.  Plaintiff has now been diagnosed with a full recovery and capable of rational thought. Plaintiff can now see clearly that he was manipulated, and Midgal was acting in bad faith during the negotiations that preceded the 2008 Agreement.

66.  Brand confusion between Faceparty and Facebook continues to this date. For example, Plaintiff still receives emails which mix Faceparty up with Facebook. Plaintiff still owns trademarks for various goods and services in the US and the UK for the "Faceparty" mark. However, the Faceparty brand is no longer a viable brand due to the confusion between

---

**13**

COMPLAINT

1  Faceparty and Facebook. It is important to note that brand confusion between Faceparty and

2  Facebook occurs in the US too and not just in the UK and that Faceparty had 100,000s of US

3  customers.

4      67.    Plaintiff only learned in July 2020 that Defendant received corporate funding

5  investment in 2004 and therefore Defendant/s had intentionally misled Plaintiff to avoid liability.

6  Defendants' representations were false, misleading and material to the settlement discussions

7  and Plaintiff reasonably relied upon them when it declined to enforce its rights in the US and the

8  UK.

9      68.    In 2006 Plaintiff initiated psychotherapy care and his treatment extended for more

10 than a decade. Financial difficulties would continue to trigger PTSD, that would substantially

11 interfere with his ability to secure and maintain employment or enable him to recover.

12     69.    On or around October 10, 2018 Plaintiff had sufficiently recovered to understand

13 the events of 2008 during a psychotherapy session. Since October 10, 2018 Plaintiff's health has

14 not only recovered rapidly, but he was able to investigate and corroborate the events surrounding

15 the 2008 Agreement.

16                    **FIRST CAUSE OF ACTION**

17                       **PROMISSORY FRAUD**

18              **(Against all Defendants and DOES 1-10, inclusive)**

19     70.    Plaintiff re-alleges and incorporates by reference all prior paragraphs as though

20 fully set forth herein.

21     71.    Defendants made a promise to the Plaintiff and to Faceparty that it had no

22 intention to fulfill, including but not limited to the promise that Defendants would limit

23 Facebook only to people in schools and universities in the United States.

24     72.    Plaintiff acted with reasonable reliance on the inducement by the Defendants.

25     73.    Defendants in fact made these promises to Plaintiff.

26     74.    Defendants in fact did not intend to perform these promises and the Defendants

27 intended that Plaintiff rely on these promises.

28     75.    Plaintiff did in fact reasonably rely on Defendants' promises.

76.     Defendants did not perform the promised acts.

77.     As a result, Plaintiff was harmed and Plaintiff's reliance on the Defendants' promises was a substantial factor in causing the harm.

78.     As a proximate result of the Defendants' actions, Plaintiff has been damaged in excess of the jurisdictional minimum of this Court, which will be proven at trial.

## SECOND CAUSE OF ACTION

### CONCEALMENT

**(Against all Defendants and DOES 1-10, inclusive)**

79.     Plaintiff hereby incorporates by reference each, every, and all of the allegations of this Complaint as though fully set forth herein.

80.     Defendants suppressed material facts and information of other facts that were likely to mislead Plaintiff for want of communication of those facts, which comprise concealment. Plaintiff was misled, defrauded and deprived of his legal rights.

81.     Plaintiff was harmed because the Defendants concealed certain information, including but not limited to the fact that Facebook would not be limited to people only in schools and universities and that Facebook had secured significant financial investment.

82.     Defendants intentionally failed to disclose certain facts to Plaintiff, including the fact that Facebook would not be limited to people only in schools and universities.

83.     Plaintiff did not know of the concealed facts.

84.     Defendants intended to deceive Plaintiff by concealing facts.

85.     Had the omitted information been disclosed, Plaintiff reasonably would have behaved differently.

86.     Plaintiff was in fact harmed and Defendants' concealment was a substantial factor in causing Plaintiff's harm.

87.     As a proximate result of the Defendants' actions, Plaintiff has been damaged in excess of the jurisdictional minimum of this Court, which will be proven at trial.

## THIRD CAUSE OF ACTION

### RESCISSION OF CONTRACT

**(Against all Defendants and DOES 1-10, inclusive)**

88.     Plaintiff re-alleges and incorporates by reference all prior paragraphs as though fully set forth herein.

89.     Plaintiff seeks rescission of the 2008 contract. A contracting party has a right to what it contracted for, and so has the right to rescind where he obtained something substantially different from that which he is led to expect. (Civil Code §§ 1688, et seq.).

90.     With his consent given under lack of capacity to enter into an agreement, mistake or by fraud, Plaintiff seeks rescission and declaratory relief (Civil Code § 1692).

91.     The 2008 Agreement is voidable or otherwise subject to rescission, with restitution plus interest to Plaintiff, at Plaintiff's option because, without limitation: (i) any consent given by Plaintiff to the agreement was given by mistake; and/or (ii) any consent given by Plaintiff to the agreement was obtained by fraud exercised by Defendants; and/or (iii) any consent given by Plaintiff to the agreement was obtained by duress, menace, or undue influence exercised by Defendants (CA Civ Code § 1689 (b) (1) and § CA Civ Code 1567); and/or (iv) any consideration for Plaintiff's obligations under the agreement fails and/or is entirely void due to Plaintiff's lack of capacity to enter into an agreement.

92.     A contract entered into by someone entirely without understanding is void, not merely voidable. Gibson v Westoby (1953) 115 CA2d 273, 276.

93.     Plaintiff asserts the right to rescind under "any other statute providing for rescission." (Civil Code, §§ 1689(b)(7)).

94.     Plaintiff seeks any and all relief that is necessary to adjust the equities between the parties and ensure restoration to the pre-contract status quo. (Civil Code, § 1692).

95.     As a proximate result of the Defendants' actions, Plaintiff has been damaged in excess of the jurisdictional minimum of this Court, which will be proven at trial.

## FOURTH CAUSE OF ACTION

### INTENTIONAL MISREPRESENTATION - FRAUD

**(Against all Defendants and DOES 1-10, inclusive)**

96.     Plaintiff re-alleges and incorporates by reference all prior paragraphs as though

1    fully set forth herein.

2          97.    Defendants intentionally made false statements of a material fact relating to its

3    business and the circumstances during both the 2005 promise and the July 4, 2008 Agreement.

4          98.    The Defendants knew the representations were false.

5          99.    The Defendants intended that the misrepresentation would induce the Plaintiff to

6    act on the misrepresentations.

7          100.   Plaintiff reasonably relied on the misrepresentations.

8          101.   Plaintiff was damaged by acting in reliance on the misrepresentation.

9          102.   Had Plaintiff known the true facts, it would not have entered into any agreements

10   with Defendants.

11         103.   As a proximate result of Defendants' misrepresentations, Plaintiff has been

12   damaged in an amount excess of the jurisdictional minimum of this Court, which will be proven

13   at trial.

14         104.   Each of the Defendants knew a fraud was occurring. Notwithstanding their

15   knowledge of the fraudulent conduct, the Defendants, and each of them, engaged in the conduct,

16   hereinbefore described, which renders substantial assistance to, encouraged and/or aided and

17   abetted the fraud.

18         105.   In performing the acts set forth above, Defendants acted with oppression, fraud

19   and/or malice entitling Plaintiff to exemplary and punitive damages in an amount which will be

20   proven at trial.

21         106.   On account of this fraud, the 2008 agreement should be rescinded.

22                              **FIFTH CAUSE OF ACTION**

23         **FRAUD IN CONTRACT FORMATION (Civil Code section 1572)**

24              **(Against all Defendants and DOES 1-10, inclusive)**

25         107.   Plaintiff re-alleges and incorporates by reference all prior paragraphs as though

26   fully set forth herein.

27         108.   Defendants intentionally made false statements of a material fact relating to its

28   business and the circumstances preceding the July 4, 2008 Agreement which constitutes fraud.

109. The Defendants knew the representations were false.

110. The Defendants intended that the fraudulent misrepresentation would induce the Plaintiff to act on the misrepresentations.

111. Plaintiff reasonably relied on the misrepresentations.

112. Plaintiff was damaged by acting in reliance on the misrepresentations.

113. As a proximate result of the Defendants' actions, Plaintiff has been damaged in excess of the jurisdictional minimum of this Court, which will be proven at trial.

114. In addition, on account of the above, the 2008 Agreement should be rescinded.

## SIXTH CAUSE OF ACTION
### ACTIONABLE DECEIT (Civil Code section 1709)
### (Against all Defendants and DOES 1-10, inclusive)

115. Plaintiff re-alleges and incorporates by reference all prior paragraphs as though fully set forth herein.

116. The Defendants statements to Plaintiff constitute actionable deceit under Civil Code section 1709.

117. Plaintiff reasonably relied on the misrepresentations.

118. Plaintiff was damaged by acting in reliance on the misrepresentations and Defendants are liable for such damages.

119. As a proximate result of the Defendants' actions, Plaintiff has been damaged in excess of the jurisdictional minimum of this Court, which will be proven at trial.

120. In addition, on account of the above, the 2008 Agreement should be rescinded.

## SEVENTH CAUSE OF ACTION
### TRADEMARK INFRINGEMENT
### (Against all Defendants and DOES 1-10, inclusive)

121. Plaintiff re-alleges and incorporates by reference all prior paragraphs as though fully set forth herein.

122. The Faceparty Marks owned by Plaintiff have been continuously used since at least as early as 2000. Plaintiff has never authorized nor consented to the Defendant's use of any

term which is the same as, is confusingly similar to, or constitutes a colorable imitation of, the FACEPARTY Mark in commerce in connection with their products or services and with the 2008 Agreement rescinded, also the FACE Mark. .

123. Defendants' actions, as alleged above, are likely to cause confusion, mistake or deception in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

124. Plaintiff is informed and it believes and, based thereon it alleges that Defendant's acts have been undertaken with full knowledge of Plaintiff's Marks and with the willful and deliberate intent to cause confusion, mistake and deception among members of the relevant public and to trade on the goodwill associated with the Marks or create reverse confusion.

125. By reason of Defendant's acts, as alleged herein, Plaintiff will suffer damage to its business, reputation and goodwill and Defendant will make profits and sales it would not have made but for Defendant's conduct.

126. Defendant's acts will cause irreparable and immediate injury to Plaintiff for which Plaintiff has no adequate remedy at law. Unless Defendant is restrained by this Court from continuing their unauthorized use of words and symbols that are confusingly similar to Plaintiff's Marks, these injuries will continue to occur.

127. As a proximate result of the Defendants' actions, Plaintiff has been damaged in excess of the jurisdictional minimum of this Court, which will be proven at trial.

## EIGHTH CAUSE OF ACTION

### FALSE DESIGNATION OF ORIGIN

### (Against all Defendants and DOES 1-10, inclusive)

128. Plaintiff re-alleges and incorporates by reference all prior paragraphs as though fully set forth herein.

129. The FACEPARTY Marks and associated Trade Dress are owned by Plaintiff and Plaintiff, or its predecessors in interest, have continuously used them in commerce for many years. Plaintiff has never authorized or consented to the Defendant's use of the Marks or any similar words or names in connection with their products nor has it consented to use of its Trade Dress. This extends to the FACE Mark on the rescinding of the 2008 Agreement.

130.   Defendants' actions, as alleged above, are likely to cause confusion, mistake or deception as to the affiliation, connection or association of the Defendants with Plaintiff, or as to the origin, sponsorship or approval of Defendants' products or services by Plaintiff in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

131.   Plaintiff is informed and it believes and, based thereon it alleges that Defendant's acts have been undertaken with full knowledge of Plaintiff's rights in and to Plaintiff's Marks and Trade Dress and Trade Dress with the willful and deliberate intent to cause confusion, mistake and deception among members of the relevant public and to trade on the goodwill associated with the marks.

132.   By reason of Defendant's acts, as alleged herein, Plaintiff will suffer damage to its business, reputation and goodwill and Defendant will realize profits and sales it would not have made but for Defendant's conduct

133.   Defendant's acts will cause irreparable and immediate injury to Plaintiff for which Plaintiff has no adequate remedy at law. Unless Defendant is restrained by this Court from continuing their unauthorized use of words, symbols, and packaging that are confusingly similar to the FACEPARTY Marks and Trade Dress. these injuries will continue to occur.

134.   As a proximate result of the Defendants' actions, Plaintiff has been damaged in excess of the jurisdictional minimum of this Court, which will be proven at trial.

### NINTH CAUSE OF ACTION

### TRADEMARK DILUTION (Under Cal. Bus. & Prof. Code §14247)

### (Against all Defendants and DOES 1-10, inclusive)

135.   Plaintiff re-alleges and incorporates by reference all prior paragraphs as though fully set forth herein.

136.   The FACEPARTY trademark is distinctive and famous within the meaning of Cal. Bus. & Prof. Code §14247 and within the UK.

137.   Defendants' use of the FACEBOOK trademark began after the FACEPARTY trademark became famous.

138.   Defendants' continued use of the FACEBOOK trademark is likely to cause injury

to Plaintiff's business and reputation and the dilution of the distinctive quality of Plaintiffs' famous FACEPARTY trademark in violation of Cal. Bus. & Prof. Code § 14247 and the laws of the United Kingdom.

139.   Plaintiff has been, and will continue to be, damaged and irreparably harmed by the actions of the Defendants, which will continue unless Defendants are enjoined by this Court.

140.   Plaintiff has no adequate remedy at law in that the amount of damage to Plaintiff's business and reputation and the diminution of the goodwill of the FACEPARTY trademark is difficult to ascertain with specificity. Plaintiff is therefore entitled to injunctive relief pursuant to Cal. Bus. & Prof. Code § 14247 and the laws of the United Kingdom.

141.   The actions of Defendants described herein were and continue to be deliberate and willful. Plaintiff is therefore entitled to recover damages in an amount to be determined at trial, profits made by Defendants, and the costs of this action pursuant to Cal. Bus. & Prof. Code.

142.   In the UK, again dilution occurs through blurring or tarnishment of the reputation of a well-known or famous trademark.

143.   The Faceparty mark has a reputation in the UK.

144.   The Facebook mark has similarity to the Faceparty mark and its use takes advantage and/or causes detriment to the distinctive character or repute of Plaintiff's mark.

145.   Defendants use of the Facebook mark is without due cause.

146.   As a proximate result of the Defendants' actions, Plaintiff has been damaged in excess of the jurisdictional minimum of this Court, which will be proven at trial.

## TENTH CAUSE OF ACTION

### COMMON LAW TRADEMARK INFRINGEMENT

### (Against all Defendants and DOES 1-10, inclusive)

147.   Plaintiff re-alleges and incorporates by reference all prior paragraphs as though fully set forth herein.

148.   By reason of Defendants' acts, as alleged herein, Plaintiff will suffer damage to its business, reputation and goodwill and Defendant will realize profits and sales it would not have made but for Defendant's conduct.

149.    The above-described acts of Defendant constitute common law trademark, trade name, and trade dress infringement. Such acts will cause and will continue to cause irreparable and immediate injury to Plaintiff for which Plaintiff has no adequate remedy at law. Unless Defendant is restrained by this Court from continuing the acts alleged herein, these injuries will continue to occur.

150.    On information and belief, the foregoing acts of Defendant are oppressive, fraudulent, willful and malicious in that they have been undertaken with a conscious disregard of Plaintiffs' rights and with a desire to injure Plaintiff's business and to improve its own.

151.    As a proximate result of the Defendants' actions, Plaintiff has been damaged in excess of the jurisdictional minimum of this Court, which will be proven at trial.

## ELEVENTH CAUSE OF ACTION

## PROMISSORY ESTOPPEL

### (Against all Defendants and DOES 1-10, inclusive)

152.    Plaintiff re-alleges and incorporates by reference all prior paragraphs as though fully set forth herein.

153.    With the 2008 Agreement having been rescinded, previous promises and agreements come back into force, including the 2005 promise by Defendant/s never to trade outside of schools or universities, which immediately results in a new breach of the promise.

154.    In justifiable and highly detrimental reliance on the promises made by Defendants, Plaintiff did in fact act in reliance.

155.    On the basis of said representations by Defendants, Plaintiff elected not to pursue available options for Faceparty, as Plaintiff believed Defendants' representations that Facebook would be limited to only people in schools and universities.

156.    As a result of the promises made by Defendants, combined with the justifiable and detrimental reliance by Plaintiff on said promises, Defendants were thereafter forever estopped under well-established principles of equity from pursuing Facebook outside the school and university context.

157.    Nonetheless, Defendants instead did in fact pursue Facebook outside the school

1    and university context, a clear and unambiguous deviation from Defendants' earlier
2    representations.

3           158.    The unconscionable pursuits of Facebook therefore by Defendants operated as a
4    unilateral repudiation of promise by one of the parties thereto, and was neither agreed to nor
5    acquiesced in nor ratified by Plaintiff.

6           159.    As a result of the promises made by Defendants on which Plaintiff justifiably and
7    detrimentally relied, Plaintiff has suffered additional loss of income and the unanticipated
8    continued threat of additional losses and harms.

9           160.    As a result of the fraudulent and shamelessly inequitable conduct of Defendants,
10   Plaintiff is entitled to the value of the benefit promised, represented and agreed by Defendants.
11   Plaintiff is additionally entitled to compensation for the amounts inequitably and unlawfully
12   extracted by Defendants pursuant to the agreement and such other relief as is required and
13   appropriate to do equity and provide redress for Defendants' inequitable conduct.

14          161.    As a proximate result of the Defendants' actions, Plaintiff has been damaged in
15   excess of the jurisdictional minimum of this Court, which will be proven at trial.

16                             **TWELFTH CAUSE OF ACTION**
17                   **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
18                      **(Against all Defendants and DOES 1-10, inclusive)**

19   1.  Plaintiff re-alleges and incorporates by reference all prior paragraphs as though fully set
20        forth herein.

21   2.        Pursuant to California Civil Jury Instructions (CACI) 1620, entitled "Negligent
22   Infliction of Emotional Distress", Defendants' conduct caused Plaintiff to suffer serious
23   emotional distress. Defendants' negligent and wrongful conduct, and/or omissions, were a
24   substantial factor in causing Plaintiff to suffer serious emotional distress.

25   3.        Emotional distress includes suffering, anguish, fright, horror, nervousness, grief,
26   anxiety, worry, shock, humiliation, and shame, all of which Plaintiff was wrongfully forced to
27   undergo due to the Defendants' wrongful conduct.

28   4.        Serious emotional distress exists if an ordinary, reasonable person would be

                                            **23**
                                         COMPLAINT

1 unable to cope with it, which in this case includes the standard of an ordinary, reasonable person

2 under like circumstances such as Plaintiff.

3    5.    As a direct and proximate result of the acts and omissions detailed herein,

4 Plaintiff suffered and continues to suffer serious, severe, substantial and enduring psychological,

5 emotional and mental injuries.

6    6.    By reason of the foregoing, Defendants are liable for, and Plaintiff is entitled to

7 recover from them, his general, special, actual and compensatory damages, including, but not

8 limited to, his necessary past, present and future medical and related expenses, as well as mental,

9 emotional and physical pain and suffering, as proven at time of trial.

10    7.    Plaintiff suffered emotional distress both as a direct victim and as a by-stander

11 victim.

12    8.    As a proximate result of the Defendants' actions, Plaintiff has been damaged in

13 excess of the jurisdictional minimum of this Court, which will be proven at trial.

14 ### THIRTEENTH CAUSE OF ACTION

15 ### UNFAIR BUSINESS PRACTICES (under Cal. Bus. & Prof. Code §17200)

16 ### (Against all Defendants and DOES 1-10, inclusive)

17    9.    Plaintiff re-alleges and incorporates by reference all prior paragraphs as though

18 fully set forth herein.

19    10.    The Defendants' actions described above show that Defendants have engaged in

20 unlawful, unfair or fraudulent business acts or practices in violation of Cal. Bus. & Prof. Code

21 §17200.

22    11.    As a direct result of the unfair competition and unfair business practices, Plaintiff

23 has been damaged in excess of the jurisdictional minimum of this Court, which will be proven at

24 trial.

25 ### FOURTEENTH CAUSE OF ACTION

26 ### INTENTIONAL INTERFERENCE with PROSPECTIVE ECONOMIC ADVANTAGE

27 ### (Against all Defendants and DOES 1-10, inclusive)

28    12.    Plaintiff and Faceparty had an economic relationship with its 6,500,000+

customers, with the probability of future economic benefit;

13.    The Defendant knew of the relationship;

14.    The Defendant engaged in wrongful conduct in order to disrupt the relationship or with knowledge that disruption was substantially certain to occur;

15.    As a result of Defendants' conduct, the relationship was actually disrupted, and

16.    Because of the disruption, Plaintiff suffered economic harm.

17.    As a proximate result of the Defendants' actions, Plaintiff has been damaged in excess of the jurisdictional minimum of this Court, which will be proven at trial.

## FIFTEENTH CAUSE OF ACTION

### UNJUST ENRICHMENT

**(Against all Defendants and DOES 1-10, inclusive)**

18.    Plaintiff re-alleges and incorporates by reference all prior paragraphs as though fully set forth herein.

19.    Unjust enrichment occurs when a party is enriched at the expense of another in circumstances that the law sees as unjust, including where an agreement has been ruled unenforceable due to incapacity or where fraud has occurred. Where a party is unjustly enriched, the law imposes an obligation upon the recipient to make restitution.

20.    Defendants clearly have been unjustly enriched at the expense of Plaintiff.

21.    By reason of the foregoing, said Defendants, and each of them, are liable for, and Plaintiff is entitled to recover damages, in an amount exceeding the minimum jurisdictional limits of this Court and as proven at time of trial.

//

//

//

//

//

//

//

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays judgment against Defendants as hereinafter set forth.

      1.      For actual damages in the principal amount of not less than $5,000,000.00.

      2      For other general and special damages according to proof.

      3      For an award of prejudgment interest at the legal rate, and an award of post-judgment interest until the judgment is fully satisfied.

      4      For restitution.

      5      For compensatory damages.

      6      For an award of reasonable attorneys' fees incurred herein.

      7      For punitive and exemplary damages.

      8      For expenses and costs of suit incurred.

      9      For such other and further relief as the Court may deem proper.

Dated:  September 25, 2020

ANDREW DAVID BAMFORTH
Plaintiff, In Pro Per

ANDREW DAVID BAMFORTH
340 S Lemon Ave #3051
Walnut, CA 91789
Telephone: 1-800-572-3982 extension 1
legal@faceparty.com

Plaintiff, IN PRO PER

**Electronically**
**FILED**
by Superior Court of California, County of San Mateo
ON      **12/2/2020**
By_____**/s/ Anthony Berini**_____
        **Deputy Clerk**

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN MATEO

ANDREW DAVID BAMFORTH, an
individual,

Plaintiff,

vs.

FACEBOOK, INC., a business entity;
MARK ZUCKERBERG, an individual;
and DOES 1 through 10, inclusive

Defendants.

Case No.:  **20-CIV-04375**

**PLAINTIFF'S FIRST AMENDED**
**COMPLAINT FOR DAMAGES:**
  1.  Promissory Fraud
  2.  Concealment
  3.  Rescission of Contract
  4.  Intentional Misrepresentation – Fraud
  5.  Fraud in Contract Formation
  6.  Actionable Deceit
  7.  Trademark Infringement
  8.  False Designation of Origin
  9.  Trademark Dilution
  10. Common Law Trademark Infringement
  11. Promissory Estoppel
  12. Negligent Infliction of Emotional Distress
  13. Unfair Business Practices
  14. Intentional Interference with Prospective
      Economic Advantage
  15. Unjust Enrichment

UNLIMITED ACTION

**DEMAND FOR JURY TRIAL**

Original Complaint filed: 10/8/2020
Trial Date: none set

Comes Now Plaintiff, ANDREW DAVID BAMFORTH, and alleges as follows:

### PARTIES

1.     Plaintiff ANDREW DAVID BAMFORTH ("Plaintiff"), is an individual and a

1
COMPLAINT

1 | citizen of the United Kingdom, resides in the United Kingdom and has a US address at 340 S

2 | Lemon Ave #3051, Walnut, CA 91789.

3 |     2.     Plaintiff owns the website Faceparty ("Faceparty") including certain associated

4 | intellectual property assets and registered trademarks. The Faceparty website is operated under

5 | license by I Blame Television Ltd, a business entity based in the United Kingdom. Plaintiff also

6 | owns certain residual rights and assets of CIS Internet Ltd t/a Faceparty, a private limited

7 | company created under the laws of the United Kingdom, now dissolved.

8 |     3.     On information and belief, Defendant FACEBOOK, INC. ("Facebook") is a

9 | business entity, doing business in Menlo Park, County of San Mateo, State of California and

10 | includes any predecessors in interest.

11 |     4.     On information and belief, Defendant MARK ZUCKERBERG ("Zuckerberg") is

12 | an individual, doing business in Menlo Park, County of San Mateo, State of California.

13 | **JURISDICTION/VENUE**

14 |     5.     This Court has subject matter jurisdiction over this action, and venue in the court

15 | is proper, because both named Defendants do business in this County. Further, aspects of this

16 | dispute are premised on an Agreement with Defendant Facebook that includes a provision that

17 | any disputes be resolved in the Courts of Northern California.

18 |     6.     This action asserts both state and federal trademark claims and this court has

19 | concurrent jurisdiction over such claims.

20 | **BACKGROUND & GENERAL ALLEGATIONS**

21 |     7.     Plaintiff has a history of novel invention, which on information and belief

22 | includes the creation of the world's first social networking website, almost a decade before the

23 | Defendant/s created Facebook. Plaintiff's website operated under a number of different domain

24 | names, before it settled on "Faceparty.com" in 2000. The brand "Faceparty" had existed from

25 | 1998, where it was a sub-section of Plaintiff's previous websites operating under different

26 | domains. Plaintiff has organized events under the Faceparty brand since March 1999.

27 |     8.     Between 2000 and 2008, Faceparty was operated under license by CIS Internet

28 | Ltd. Plaintiff was the sole owner, shareholder and operator of CIS Internet, Ltd. until it was

1    dissolved and Plaintiff is a successor in interest to all of its remaining assets.

2         9.    Before Facebook existed, Independent auditing body ABC reported that
3    Faceparty served 1.5 billion web pages per month. In 2005 independent data from Hitwise (an
4    audit body who analyzed internet traffic) repeatedly reported Faceparty as the most popular
5    online community by page impression and as the 4th most visited website in the world, for the
6    UK audience. In April 2005 Google's UK press office announced that "Faceparty" was the 5th
7    most searched word of all words on Google.

8         10.   On information and belief, Defendant/s first acquired the Facebook.com domain
9    in or around August 2005.

10        11.   Prior to August 2005, Faceparty was a well-known brand, known by Internet
11   users throughout the world including the United States. Google alone displayed 48,775,448 paid-
12   for adverts for Faceparty in the United States between December 2003 and August 2005. In
13   April 2005 over 300,000 Americans had already joined Faceparty's social network.

14        12.   Between August 2000 and August 2005 Faceparty spent in excess of $5,600,000
15   developing and protecting the Faceparty brand globally and had acquired an active user-base of
16   5.2 million unique visitors per month [independently audited by ABC Electronic media Audits].

17        13.   In 2006 Faceparty was awarded the prestigious Superbrand award on account of
18   its leading, global and unique brand identity. A-List celebrities such as Justin Timberlake and
19   Beyoncé along with brands such as Coca Cola and Virgin hosted fan clubs on Faceparty.

20        14.   By 2008 Faceparty had gained more than 8.4 million members and was
21   particularly popular in the United Kingdom, where an average of 1 in 5 inhabitants - between the
22   ages of 16 and 64 - had created Faceparty accounts.

23        15.   Faceparty was a key pioneer of the Internet today, from a social perspective.
24   Faceparty also produced one of the very first social media apps, which came pre-installed on
25   many Nokia handsets in the United Kingdom. On information and belief, Faceparty's Messenger
26   app predated Facebook's Messenger app.

27        16.   On information and belief, the term "Social Network" was coined by Fox News to
28   describe Plaintiff's invention, during an interview between Fox and Plaintiff in circa 2002/2003.

17.    Faceparty was so unique and popular that as from 2001, dozens of copycat sites were created by competitors, who wanted to benefit from Plaintiff's invention. Many of these copycat websites would clone Faceparty's features ("browse members", software-free instant messaging, friend-requests, friends list, face-time etc.) along with Faceparty's blue and white color scheme. Most often, the copycat sites would operate under similar names to Faceparty which caused confusion in the marketplace and in particular caused people to believe the copycat sites were official extensions of Faceparty. Many of these copycat websites began with the word "Face" (including but not limited to "Facebox", "Facemates", "Faceclub", "Facemeet", "Facelush", "Facehour", "Facetribe", "Facebuddies" etc.) and on information and belief, the names were deliberately selected to trade off the goodwill associated with the Faceparty trademark.

18.    Faceparty registered its trademarks to protect the Faceparty brand in the UK and USA (and other countries), including the trademark of the word "FACE" (which was registered in classes relevant to online communities) in both Europe and the UK and with pending registration in the United States;

19.    Plaintiff or its associated company were issued the following registrations;

    a.   "Face" (word) in class 38 in Europe (including UK) Reg. No. 3852779.

    b.   "Faceparty" (word) in Classes 25, 38, 41 in USA Reg. No. 3291100.

    c.   "Faceparty" (word) in Classes 16, 25, 35, 38, 41 in UK Reg. No. 2383978.

    d.   "Faceparty" (word logo) in Classes 16, 25, 38, 41 in UK Reg. Nos. 2364009 and 2330204.

    e.   "FP" (word) in Classes 38, 41 in UK Reg. No. 2384299.

    f.   "FP" (word) in Classes 35, 38, 41 in EU (incl. UK) Reg. No. 4282356.

    g.   "Faceparty" (word) in Classes 16, 25, 35, 38, 41 in EU (incl. UK) Reg. No. 4279428.

    h.   "Faceparty" (word logo) in Classes 25, 35, 38, 41 in EU (incl. UK) Reg. No. 3852647.

    i.   Other trademarks associated with the Plaintiff's Faceparty brand.

20.     Pending registrations included;

    a.   "Face" (word) in Classes 16, 25, 35, 38, 41, 45 in USA

    b.   "Faceparty" and "Face" marks in many other countries around the world, including Australia, Canada and Europe.

21.     In total, Plaintiff had trademarks in 31 countries (including EU).

22.     Cease and Desist letters were sent to those infringing the Face and Faceparty marks; these letters had success in protecting the Faceparty brand and competitors would change their names as not to cause confusion.

23.     In 2004 Defendants Zuckerberg and Facebook created a website which was highly similar to Faceparty, and had a number of Faceparty's unique features, including Faceparty's blue and white color scheme and traded with the dominant word "Face"; The defendant's website is now widely known, trading under the name "Facebook".

24.     Examples of Faceparty's features which also appeared on the Facebook website included software-free instant messaging, friends list, friend-requests, messaging, face-time, browse members, groups and member profiles with galleries. In addition, the layout between Facebook and Faceparty was also similar. For example, both sites had a box on the right hand column of a member's profile which stated the member's favorite music, favorite TV show, favorite movie and favorite book. The order in which these "favorites" were displayed was identical on both websites, despite Faceparty existing for several years prior to Facebook. Facebook also used the same terminology to describe some of its features which - on information and belief - Faceparty had coined, such as "Browse Members".

25.     Plaintiff first became aware of Facebook in early 2006, when Faceparty received a number of emails from people asking to cancel their Facebook accounts; members of the public had confused "Faceparty" with "Facebook".

26.     Defendants were sent a Cease and Desist letter in or around February, 2006, asking them to change their name as not to include "Face", citing Plaintiff's prior registered trademarks and pending applications.

27.     The Cease and Desist letter resulted in a telephone conversation between

1    Defendant/s and Faceparty. On information and belief the representative from Facebook was

2    Defendant Mark Zuckerberg.

3         28.     During the resulting conversation Defendant represented that Facebook was just a

4    school project. Defendant pleaded to be allowed to keep his website's "Facebook" name,

5    assuring that he would never trade outside of schools. Plaintiff and Faceparty agreed to refrain

6    from legal action and allowed Defendant/s to continue to use the word "Face" in its name on

7    strict condition that Defendant/s upheld their promise not to trade outside of the academic

8    environment, nor outside of the United States.

9         29.     There were several reasons why Plaintiff and Faceparty agreed to forgo legal

10   action and allow Defendant to trade with the name "Face", including;

11            a.   Defendant Zuckerberg was a college student and the use of the mark was

12                 represented to be limited to college students;

13            b.   Because it was a project for school, Defendants' website was not expected to

14                 directly compete with Faceparty site;

15            c.   Since the Facebook site did not have funding it was not expected to be a serious

16                 threat to Faceparty;

17            d.   The Faceparty website was focused on the United Kingdom, where the bulk of its

18                 customers resided and where Defendants did not operate; and

19            e.   There had only been 3 or 4 instances of brand confusion at the time of the

20                 discussions, which were manageable by Faceparty.

21        30.     In 2006 during the discussions with Defendant, neither Plaintiff nor Faceparty

22   were aware that in or around the summer of 2004, venture capitalist Peter Thiel had made a

23   $500,000 angel investment in Facebook for 10.2% of the company. Contrary to Defendant's

24   representation, Facebook was by no means just a school project, and as such Defendant/s

25   intentionally deceived Plaintiff and Faceparty.

26        31.     Between 2004 and 2006, the core difference between Faceparty and Facebook

27   was that Facebook was limited to people in universities. Should Facebook have traded outside of

28   universities, then there would have been little difference between the products. Essentially

1 Facebook's concept was a "Faceparty for Schools".

2     32.    On information and belief it appears that Facebook did not trade outside of
3 universities nor outside of the United States for at least several months following the 2006
4 conversation.

5     33.    However, by late 2006 Facebook had filed multiple trademark applications for
6 "Facebook", including applications for trademarks outside of the United States. Faceparty
7 responded by strongly objecting to Facebook's trademark applications.

8     34.    On information and belief, in or around September 2006, Facebook broke its
9 promise with Plaintiffs and allowed anyone to join Facebook, regardless as to whether they were
10 a student or not and regardless as to what country they lived in. Facebook's growth was rapid.

11     35.    By early 2006 at the latest, on information and belief, Defendants were already
12 aware that brand confusion was occurring between Faceparty and Facebook. With full
13 knowledge of the actual and likelihood of confusion, Defendants showed reckless disregard and
14 launched their product in the UK, despite their promise and despite infringing Faceparty's
15 registered trademarks.

16     36.    The decision to enter the UK market by Defendants was made intentionally and in
17 bad faith and with knowledge it would lead to confusion.

18     37.    Immediately upon Facebook's launch into the UK, Faceparty began to suffer
19 increased and significant brand confusion and has since received an incredible volume of emails
20 confusing "Faceparty" with "Facebook".

21     38.    In addition, many Facebook members would abbreviate "Facebook" to "FB",
22 which sounds near identical to Plaintiff's "FP" trademark.

23     39.    From 2006 onwards, a large and increasing number of people in the UK were
24 likely to confuse the Faceparty social networking site with the Facebook social networking site.

25     40.    Faceparty engaged a law firm to write to Defendant Facebook to prevent them
26 from trading under the name "Facebook" and informed Defendant that legal action would be
27 taken if they continued to trade under the "Facebook" name. Faceparty continued to oppose
28 pending trademarks that Defendants had filed in the US Patent and Trademark Office and in the

1    United Kingdom and in other countries.

2        41.    On or around 24 January 2007, Facebook's head of business development, Dan

3    Rose, contacted Faceparty's commercial director, Matt Nash, with a goal of finding a way to

4    reach a peaceful co-existence for the two brands.

5        42.    Nash made clear that co-existence could only be possible if (a) it was financially

6    worthwhile for Plaintiff and Faceparty and (b) the risk of brand confusion was eliminated or at

7    least suffifently mitigated, for example by a substantial and significant marketing campaign.

8        43.    By 2007 Faceparty had spent circa $10,000,000 on protecting, developing and

9    promoting the Faceparty brand and as such any consideration towards co-existence would need

10   to be significantly worthwhile.

11       44.    Nash and Rose were unable to reach an agreement on behalf of Faceparty and

12   Facebook, on account that they were unable to agree on a fair fee. Nash had proposed

13   $10,000,000 spread over a number of years or a lump sum of $8,000,000 for (a) the sale of the

14   "Face" mark and (b) for Faceparty to withdraw its objections to Facebook's trademark

15   applications and (c) for Facebook to issue a perpetual license to permit Faceparty to trade under

16   its name. Rose offered the maximum of $1,000,000 – such a sum wouldn't even cover the cost of

17   the marketing required to mitigate against brand confusion. With no agreement having been met,

18   Faceparty continued to oppose Facebook's trademark applications. Several further attempts were

19   made between Rose and Nash to reach an agreement, but none were successful.

20       45.    The amounts discussed between the parties did not include any compensation for

21   damages on account of any brand confusion that had occurred.

22       46.    Of note: Rose made reference to the website Facebox.com in an attempt to

23   demonstrate that Facebook was not the only "Face" social network. Rose stated that Facebox and

24   Facebook were essentially no different. However, not only was Faceparty successful in having

25   Facebox change its name to Netlog, Nash was able to demonstrate that the owner of Facebox had

26   made posts on computer-programming forums immediately prior to creating Facebox, which

27   stated "I am looking for someone to make me a clone of the Faceparty.com website".

28       47.    In absence of any resolution between the parties, brand confusion continued to

1   increase.

2       48.    Throughout 2007 Facebook sent vast volumes of unsolicited "spam" emails,

3   which encouraged people to join Facebook. Faceparty received complaint letters and opt-out

4   requests from members of the public who had received these emails from Facebook and

5   mistakenly believed they had been sent by Faceparty. Faceparty's brand was damaged by this

6   confusion, because people thought negatively of Faceparty because of Facebook's spam.

7       49.    Advertising agencies also began to mix Faceparty up with Facebook. For

8   example, leading agency Starcom called Faceparty "Facebook" when booking a campaign for

9   Gillette razors and leading agency Profero called Faceparty "Facebook" when booking adverts

10   for iPod.

11       50.    On 28 February 2007, Essence Advertising Agency had also confused Faceparty

12   with Facebook. When Nash asked what led to the confusion between the two brands, the agency

13   explained, "'Party' and 'Book' may distinguish them, but only in so far as suggesting they are part

14   of the same group, with the former aimed at teens and the latter at a more mature audience."

15       51.    Nash continued to attempt to reach a resolution with Facebook, but Facebook

16   ceased communication. In an attempt to avoid the costs of litigation and with the brand

17   confusion growing, in or around April 2007 Faceparty began action against Facebook's

18   trademark applications through the Trademark Trial and Appeal Board, as an attempt to resolve

19   the matter through mitigation: CIS internet v Facebook TTAB No. 91172357

20       52.    In June 2007, Faceparty was working with Mailtrack Media to create an

21   advertising campaign for Sky Television valued at £12,000 (c$20,000). A clerical error within

22   Mailtrack Media (due to brand confusion) meant that Facebook were sent both the money and

23   advertising order intended for Faceparty by mistake. As a result Faceparty lost this money to

24   Facebook.

25       53.    Plaintiff's background is in entertainment and he has a particular passion for

26   creating immersive environments. Plaintiff recently had two TV shows commissioned (one with

27   Channel 4 and one with MTV) the latter under his Face TV brand. In order to save money on

28   studio hire fees, he converted a former derelict warehouse in London into an indoor rainforest,

1  with treehouses, secret caves, waterfalls and a derelict nuclear bunker, called "The Bunker".

2  These premises, while made for the TV shows, also served as the offices for Faceparty.

3  Faceparty's computer programmers worked in The Bunker. Facebook responded to the publicity

4  (that Faceparty gained) by sending out their own press releases, which also stated how their

5  programmers work in an area called "The Bunker". Such was intentional plagiarism intended to

6  cause confusion and for Facebook to benefit from the kudos Faceparty held.

7       54.     In June 2007, Faceparty organized a free-to-attend music event, headlined by the

8  then-current chart-topping band, The Hoosiers. The event cost approximately £130,000 (circa

9  $200,000) to produce. The purpose of the event was to gain media coverage and help position

10  Faceparty among music fans. The Sun Newspaper was the UK's largest newspaper of the time

11  [source: ABC Media Audits] and misreported the event by confusing Faceparty with Facebook,

12  with the newspaper's headline reading, "Facebook have a rainforest office and have the Hoosiers

13  playing on Wednesday!!!" The outcome of this brand confusion was that Defendants gained the

14  benefit of Faceparty's marketing work and expense. Faceparty was therefore deprived of the full

15  benefits of the c$200,000 marketing exercise and had unwittingly paid to promote Facebook.

16  The BBC also called Faceparty "Facebook" in its coverage.

17       55.     In September 2007, Facebook sold an advertising campaign comprising 3,000,000

18  page impressions to Nokia, via the MediaCom UK agency. A clerical error (due to brand

19  confusion) meant that the adverts were scheduled to appear on Faceparty instead of Facebook.

20  The outcome of this error is that Facebook would be paid for adverts served on Faceparty.

21       56.     Faceparty had begun to receive multiple job applications for people wanting to

22  work at Facebook by post and by email.

23       57.     Frustratingly, Faceparty also received negative and unsolicited correspondence

24  from members of the public (who were unaware of Faceparty's history) claiming that Faceparty

25  had stolen Facebook's idea, having a negative impact on Faceparty's brand.

26       58.     In or around September 2007 Facebook engaged attorneys Osbourne Clarke to act

27  for them in relation to the trademark tribunal Faceparty had initiated.

28       59.     Osbourne Clark sent Faceparty an unsolicited co-exitstence agreement which was

1    void of any consideration; Defendant had expected Plaintiff to share all rights in the name
2    "Face" at Plaintiff's own cost and in exchange for no payment whatsoever. Such demonstrates an
3    absurd sense of entitlement on behalf of the Defendant/s. No agreement was therefore reached.

4         60.     While some elements of brand confusion between Faceparty and Facebook  were
5    understood at the time, there was a far more complex, severe and deeper side to the brand
6    confusion that was not understood at the time and which had begun long before Plaintiff had
7    even heard of Facebook and as early as 2004/2005.

8         61.     While today the social side of the Internet is dominated by a limited number of
9    corporations, it was formerly operated by bedroom hobbyists, communities and lifestyle
10   businesses with no corporate penetration at all within the social networking space. The World
11   Wide Web was invented by British inventor Tim Berners-Lee and one of his core beliefs was
12   that the web should be void of corporate control and instead it should belong to everyone, as it
13   did for several decades. As the Internet grew in popularity, many of the world's largest media
14   corporations recognized that this "new media" could replace their traditional media; as such they
15   sought to establish a presence on the Internet;

16        62.     While corporations had tried to enter the social networking marketplace, many of
17   them failed because the people using the Internet at that time were reluctant to engage with a
18   corporate product due to their loyalty to the concept of the Internet. Many loyal to Tim Berners-
19   Lee's vision of the Internet were disappointed by Zuckerberg's decision to commercialize the
20   social side of the World Wide Web; Zuckerberg's decision was seen as a betrayal of the Internet
21   users, due to a belief that the Internet was never Zuckerberg's to sell.

22        63.     In 2005, Plaintiff's Faceparty was a not-for-profit lifestyle-business, run by a
23   group of circa 30 people on modest salaries; all profits from Faceparty were put back into the
24   community. Faceparty continued to be not-for-profit and independent when Facebook "sold-out"
25   to large powerful corporations.

26        64.     In summer of 2005 a crowd of more than a hundred people gathered outside one
27   of Faceparty's events in London, waving placards featuring the Faceparty logo which had been
28   adapted from a smiley face into an angry face. On information and belief, these protesters were

1   disgusted with Plaintiff as they believed Plaintiff had betrayed the community by "selling out"

2   and encouraged people to boycott the Faceparty website. Plaintiff had not sold-out, and on

3   information and belief, the protesters had mixed Faceparty up with the commercialized

4   Facebook;

5        65.    When Plaintiff challenged the protesters, they would not explain their anger to

6   him. Instead they would swear or throw bottles. This marked the beginning of severe damage

7   caused by brand confusion. Both Plaintiff and Faceparty had been very popular until this point.

8        66.    Even though Faceparty cost several million dollars a year to run, it relied upon

9   volunteers, donations and "mate's rates" to self-fund and survive financially. Prior to Facebook's

10  entry into the market, Faceparty had always been stable financially; Because of its popularity

11  and because it was a not-for-profit, there was never a shortage of people willing to help. For

12  instance Dell routinely donated free servers; a supplier of event staging charged Plaintiff £200

13  for services when the corporate going rate was close to £10,000; volunteers would often give up

14  the odd day for free, as they knew all profits benefitted the community.

15       67.    After Facebook "sold out", the confusion between the two websites meant that the

16  cost of operating Faceparty significantly increased. Volunteers refused to help for free, the

17  discounted rates Faceparty received were no longer available. Despite a decade of stable trading,

18  Plaintiff's organization was suddenly placed into a situation where it began to struggle to survive

19  financially. One significant factor in the financial demise of Faceparty was that former

20  supporters suddenly stopped believing Faceparty was a not-for-profit and started to believe

21  Faceparty and Plaintiff were making millions of dollars in profits – they were mixing Faceparty

22  up with Facebook and further mixing Plaintiff for Zuckerberg; the media had been reporting

23  Zuckerberg as being one of the richest people in the world and reporting Facebook as worth

24  billions of dollars -- a vast difference from Plaintiff's modest salary and his not-for-profit

25  organization.

26       68.    Plaintiff was suddenly target to groupies, stalkers and opportunists. By means of

27  example;

28             a.   Plaintiff had met some new friends in his personal life. They took him out to

dinner and after eating, they presented a proposal asking for tens of millions of [British pounds] of investment for a new entertainment venue. Plaintiff was confused as he earned a salary similar to that of a teacher. Those seeking investment had mixed Plaintiff up with Defendant/s;

   b. Plaintiff began to receive letters from strangers, including a marriage proposal containing a brochure for a mansion valued in excess of $5,000,000 which the woman had requested Plaintiff buy for her as their family home;

   c. Strangers would turn up at Plaintiff's mother's home, looking to secure financial investment in their projects from Plaintiff;

   d. Plaintiff would begin to see the same faces turn up in different friend groups without logical reason and it was clear that these people were trying to network into Plaintiff's life. This affected Plaintiff so much that he stopped associating with new people or any existing friends who engaged these "stalkers". Plaintiff began to develop trust issues and a nervous tic. This was the beginning of Plaintiff's mental health problems; Plaintiff was of good health before this.

69. Faceparty was not just an online community – it also organized real life events and festivals, including a 35,000-capacity annual event in London on a similar scale to the Coachella festival in California of the time. This was a creatively driven, not-for-profit event that raised circa $500,000 per annum for human rights charities. This event was made possible due to partnerships with London's leading nightclubs, who would program tents and stages for free (supplying free sound systems, acts and DJs etc. along with marketing the event in their clubs). Because Plaintiff organized this event in exchange for no fee to himself and to raise funds for charity, the clubs had willingly helped for fun and charity and had done for many years. Despite no fall-outs and having supported Plaintiff previously, 12 of the 20 supporting clubs suddenly grouped together and pulled-out of the event, despite having already pledged their support; these 12 clubs demanded Plaintiff paid them a fee of £10,000 each or they would not only refuse to assist but would actively organize a boycott and encourage people not to attend; Plaintiff refused the demands. On information and belief, the reason the clubs had pulled out, was that they

1    incorrectly thought that Plaintiff was earning tens of millions from projects which Plaintiff had

2    previously claimed were not-for-profit. On further information and belief, these clubs believed

3    Plaintiff was dishonest and had told lies in order to trick and manipulate people to volunteer for

4    free.  However, in reality Plaintiff had always acted in good faith. On information and belief the

5    clubs had mixed Plaintiff's income with Defendant/s' due to brand confusion. Plaintiff had

6    become hated among allies and the popular festival was cancelled leaving Plaintiff's

7    management company liable for significant debts associated with the festival.

8        70.    Before the effects of brand confusion had set in, many of Plaintiff's employees

9    had left higher paid corporate jobs to work for Faceparty. On information and belief, they had

10   worked for Faceparty at below market rates because Faceparty offered a great lifestyle and they

11   knew Plaintiff could not currently afford to match their former corporate salaries. The same

12   people also worked dozens of hours of unpaid overtime for the same reasons.

13       71.    Plaintiff ran Faceparty with an associate and friend Matthew Brindle ("Brindle"),

14   who coworkers knew received the same salary as the Plaintiff.

15       72.    In late 2006 to early 2007, co-worker Nathan McKenna approached Plaintiff in a

16   rage; McKenna was disgusted to "discover" (falsely) that Plaintiff and Brindle had secretly been

17   earning tens of millions a year, while "pretending" to be on a modest wage, in order to trick the

18   rest of the team to work unpaid over-time and work for reduced pay. McKenna produced an

19   ultimatum, whereby he demanded Plaintiff would also pay him tens of millions a year, or he

20   vowed to turn everyone against Plaintiff and Brindle and destroy Plaintiff's business. This was

21   the first time Plaintiff's own employees would mix Faceparty up with Facebook. On information

22   and belief, such confusion was based upon things they were hearing from their friends and

23   family, who had in-turn confused Faceparty with Facebook – and therefore had mistakenly

24   attributed Zuckerberg's wealth to Bamforth. McKenna proceeded to execute his threats,

25   encouraging Faceparty employees to refuse to work.

26       73.    As time went by, more people came to incorrectly believe that Plaintiff and

27   Brindle had misrepresented their income to manipulate staff into lower salaries and unpaid

28   overtime.

74.    Some of Plaintiff's disgruntled staff began looting company property: staff misused company credit cards and Plaintiff's personal credit cards; staff abused expense accounts.

75.    Around the same time, Plaintiff's father was diagnosed with cancer, and his only hope of treatment was proton therapy, which is only available as a self-pay treatment. Plaintiff had arranged to pay for this, but the money was stolen by disgruntled staff who had mistaken Plaintiff's remuneration for Zuckerberg's. This meant Plaintiff's father could not have his treatment and he died as a result. This event resulted in the worsening of Plaintiff' mental health.

76.    By mid-2007, Plaintiff had suffered a severe nervous breakdown and began to suffer from manic episodes. Plaintiff became too ill to work full-time and in or around June 2007, the day-to-day running of the business was temporarily handed over to Matt Nash.

77.    By the end of 2007, CIS Internet Ltd had become fatally insolvent, of which a primary factor was the outcome of the brand confusion. Further, the insolvency and financial difficulties would not have occurred had it not been for the brand confusion. This can be demonstrated by the fact that the revenue generated in 2007 was the company's highest and most successful ever; the financial difficulties were not caused by lack of sales, but instead caused by financial damage and increased costs due to brand confusion.

78.    As a result of the insolvency, Plaintiff was left with circa £3,300,000 of debts and liabilities (circa $5,000,000). Plaintiff was target of multiple assaults and death threats from creditors, which contributed further to Plaintiff's emotional distress and mental illness.

79.    A bank foreclosed on Plaintiff's home and took the remainder of his savings towards debts.

80.    CIS Internet Ltd's insolvency resulted in the redundancy of the majority of its staff. Nash left at the beginning of January 2008, meaning Plaintiff was forced back into work, when he did not possess the health to be working.

81.    There were no longer sufficient staff to operate the business on a day to day basis - only a small number of staff remained, including Brindle. However, Brindle (whose health had already been suffering) suffered a nervous breakdown due to the increase in pressure and became

1  too ill to work.

2      82.    Plaintiff was hurled into doing 30 people's jobs when he was too ill to do one.

3  This led to a rapid decrease in Plaintiff's mental health.

4      83.    On 18 February 2008 Plaintiff created a new limited company ["Anarchy Towers

5  Ltd"], which purchased all Intellectual Property assets from CIS Internet Ltd including but not

6  limited to all registered trademarks and rights therein. This transfer of rights was later formalized

7  in an Assignment Agreement dated 20 March 2008. For the avoidance of doubt, this assignment

8  included the trademark "Face".

9      84.    Plaintiff had a mental breakdown and was no longer able to function cognitively

10  on a day-to-day basis and began to make irrational and poor decisions. Contributing factors for

11  Plaintiff's breakdown was the pressure of the financial situation combined with the failure to

12  understand why everyone close to him had turned against him. Plaintiff sought treatment in the

13  Priory Hospital where he was diagnosed with symptoms of depression, anxiety and Post

14  Traumatic Stress Disorder ("PTSD").

15      85.    Newspapers in the United Kingdom published stories about how Plaintiff had

16  earned tens of millions, because they confused Faceparty with Facebook. One publication dated

17  April 27, 2008 listed Plaintiff as one of the richest people in the world. The confusion, amplified

18  by the newspapers and other media, caused wider confusion and confirmed people's false

19  assumptions that Plaintiff was earning tens of millions per annum;

20      86.    Many of Plaintiff's friends lost trust in him and cut him out of their lives. This

21  included Brindle who had also begun to mistrust Plaintiff due to his own trust issues and the

22  mental health problems that he had developed.

23      87.    A further factor that contributed to Plaintiff's mental health decline was the

24  mental health and physical health of his former business partner and friend, Brindle. Brindle

25  went on to suffer a stroke, which on information and belief was caused by the stress of the

26  situation. Brindle was later diagnosed with severe PTSD which rendered him unable to work,

27  and eventually resulted in him being made homeless.

28      88.    In 2008 Plaintiff suffered from auditory hallucinations in the form of multiple,

1  simultaneous "machine-gun-like" intrusive voices that he could neither escape from nor "turn-
2  off". Plaintiff lost ability to speak coherently and was arrested on three occasions due to his rapid
3  incoherent ranting; Plaintiff's attempts to communicate while jumbling his words made people
4  scared.

5       89.    During the period of his mental disability from 2006 through 2018 Plaintiff was
6  repeatedly conned and people took advantage of Plaintiff's mental breakdown.

7       90.    Throughout the first half of 2008, during Plaintiff's ill-health, and despite
8  Faceparty having legal representation Defendant's Jim Midgal ("Midgal") bypassed Plaintiff's
9  attorney and approached Plaintiff directly in relation to the legal proceedings Faceparty intended
10 to bring against Defendants for breaching Defendants' 2005 promise not to trade in the UK and
11 for breaching and diluting Faceparty's and Plaintiff's registered trademarks.

12      91.    When Midgal contacted Plaintiff, Plaintiff was a day patient at The Priory mental
13 hospital and of a mental state where he could not properly process thoughts. Plaintiff was so
14 confused in his thought process and so unsure of his own mind, that he would frequently believe
15 things that he was told, even if they would be obviously nonsensical to someone of sound mind.
16 For the majority of 2008 Plaintiff lacked capacity to make sound decisions and was unable to
17 determine differences between friends and people out to exploit him.

18      92.    Midgal knew Plaintiff was not of sound mind, because Plaintiff would send
19 Midgal tantrum-like ranting emails and because Plaintiff had made multiple deluded and
20 confused statements to Midgal, including on one occasion how Plaintiff was so confused he
21 described himself to Midgal as one of the richest people in the world; this confusion occurred as
22 Plaintiff was so ill he often believed what he was told and people would frequently tell Plaintiff
23 he was one of the richest people in the world due to the brand confusion between Faceparty and
24 Facebook. Plaintiff's mental illness caused him to switch between believing the misinformation
25 about his wealth at some times where at other times the realities of the bankruptcy were
26 overwhelmingly present and the death threats he was facing caused traumatic anxiety.

27      93.    Midgal would exploit Plaintiff's condition. On one occasion, Midgal contacted
28 Plaintiff's attorney and told the attorney that Plaintiff had agreed to sell the Faceparty trademarks

1    for $10,000 and had asked the attorney to draw up the paperwork and forward it on to Plaintiff.

2    No such conversation had ever taken place. Plaintiff's attorney was aware that Faceparty's

3    income exceeded $20,000 per day and as such any such agreement would be preposterous and

4    immediately told Midgal he didn't believe such could be true.

5    94.    Midgal continued to speak to Plaintiff. Midgal told him that Facebook had not

6    breached the 2004 promise and coerced Plaintiff into thinking it was impossible for him to win a

7    trademark infringement case against Facebook.

8    95.    Midgal also told Plaintiff that he had not created the first social network nor any

9    of its features and managed to convince Plaintiff there was no value in Faceparty's marks and

10   that brand confusion was not something that was occurring. Plaintiff was so ill that he believed

11   Midgal; Midgal was successful at changing Plaintiff's opinions.

12   96.    Midgal claimed that he was acting in Plaintiff's best interests and ensured

13   Plaintiff that signing the contract was the right thing for him to do and made clear that if Plaintiff

14   didn't accept the offer, Defendants would cause him extreme financial damage, through running-

15   up legal fees and making Plaintiff pay for them. At times Plaintiff was so scared he was

16   desperate to settle to escape the fear of the threats Midgal had made.

17   97.    Migdal's representations were false and Plaintiff relied upon these representations

18   when he considered Facebook's settlement terms.

19   98.    Midgal proposed that Facebook pay a sum of $800,000 in settlement of all claims

20   and for Faceparty to transfer the "FACE" trademark to Defendants and for an Agreement that

21   would permit Facebook to trade under its name unimpeded worldwide;

22   99.    The money offered was not sufficient to compensate Plaintiff for the damages

23   caused by the brand confusion. However, due to his illness Plaintiff believed Migdal's false

24   claims.

25   100.    Plaintiff was terrified of the additional financial damage that Midgal had

26   promised, and was coerced by Midgal into believing he had no choice; that there had been no

27   brand confusion; that there was no value in the Faceparty marks; and that assigning his

28   intellectual property to Defendant was the right thing to do - and so Plaintiff signed an

1    assignment and an agreement with Facebook on or around July 4, 2008 (the "2008 Agreement");
2    Migdal also prepared correspondence dated July 4, 2008 (the "Letter") relating to Plaintiff's
3    personal interest in the Faceparty and Face trademarks, and told Plaintiff to print it on his letter-
4    head paper, which he also signed.

5         101.    The 2008 Agreement is governed by California law.

6         102.    Plaintiff did not understand or comprehend what he was doing at the time he
7    entered the 2008 Agreement. For example;

8              a.   The July 2008 Agreement was between CIS Internet Ltd and Facebook. However,
9                   CIS Internet Ltd sold all of its rights in the Face and Faceparty trademarks back in
10                  February 2008 (formalized in March 2008). CIS Internet Ltd therefore had no
11                  authority to sell the marks nor enter into any such contract. Further CIS Internet
12                  Ltd had not been associated with Faceparty for several months.

13             b.   The Letter dated July 4, 2008 states Plaintiff has no personal rights in the
14                  trademarks, that full rights were in CIS Internet Ltd (the company who operated
15                  the website under license from Plaintiff at the time) and that there were no other
16                  owners or persons with entitlement to the trademarks. This was not accurate. On
17                  the date of July 4, 2008, Plaintiff did not have capacity to understand the letter;

18             c.   As further example, on the date of the 2008 Agreement, Plaintiff's management
19                  company CIS Internet Ltd (a party to the agreement and the nominal owner
20                  and/or licensee of certain trademark registrations) was insolvent. Consequently,
21                  Plaintiff would not have been able to benefit from the contemplated payment of
22                  $800,000; Instead, all funds received would go to the British government.
23                  Plaintiff did not and could not have benefited from any compensation paid by
24                  Facebook under the 2008 Agreement. The 2008 Agreement had no value as it
25                  would have dispensed with the Face Trademark assets, and infringement claims
26                  for no consideration.

27      103.    CIS Internet Ltd. was subsequently dissolved.

28      104.    From 2000-2006, the Faceparty website was by far a more popular product than

1   Facebook in the United Kingdom. When Facebook entered the UK market, it took the UK
2   market share because Faceparty was knocked out-of-action by brand confusion, which
3   Defendants' knew or should have known was a likely result of entering the UK market.

4       105.   Plaintiff has now been diagnosed with a full recovery and capable of rational
5   thought. Plaintiff can now see clearly that he was manipulated, and Midgal was acting in bad
6   faith during the negotiations that preceded the 2008 Agreement.

7       106.   Brand confusion between Faceparty and Facebook continues to this date. For
8   example, Plaintiff still receives emails which mix Faceparty up with Facebook and people still
9   turn up at his house or his mother's house seeking large-scale investment. Plaintiff still owns
10  trademarks for various goods and services in the US and the UK for the "Faceparty" mark.
11  However, the Faceparty brand is no longer a viable brand due to the confusion between
12  Faceparty and Facebook. It is important to note that brand confusion between Faceparty and
13  Facebook occurs in the US too and not just in the UK and that Faceparty had 100,000s of US
14  customers.

15      107.   Plaintiff only learned in July 2020 that Defendant received corporate funding
16  investment in 2004 and therefore Defendant/s had intentionally misled Plaintiff to avoid liability.
17  Defendants' representations were false, misleading and material to the settlement discussions
18  and Plaintiff reasonably relied upon them when it declined to enforce its rights in the US and the
19  UK.

20      108.   In 2006 Plaintiff initiated psychotherapy care and his treatment extended for more
21  than a decade. Financial difficulties would continue to trigger Plaintiff's mental health issues,
22  which would substantially interfere with his ability to secure and maintain employment or enable
23  him to recover.

24      109.   On or around October 10, 2018 Plaintiff had sufficiently recovered to understand
25  the events of 2008 during a psychotherapy session. Since October 10, 2018 Plaintiff's health has
26  not only recovered rapidly, but he was able to investigate and corroborate the events surrounding
27  the 2008 Agreement.

28

1

2

3

4    **FIRST CAUSE OF ACTION**

5    **PROMISSORY FRAUD**

6    **(Against all Defendants and DOES 1-10, inclusive)**

110.    Plaintiff re-alleges and incorporates by reference all prior paragraphs as though fully set forth herein.

111.    Defendants made a promise to the Plaintiff and to Faceparty that it had no intention to fulfill, including but not limited to the promise that Defendants would limit Facebook only to people in schools and universities within the United States.

112.    Plaintiff acted with reasonable reliance on the inducement by the Defendants.

113.    Defendants in fact made these promises to Plaintiff.

114.    Defendants in fact did not intend to perform these promises and the Defendants intended that Plaintiff rely on these promises.

115.    Plaintiff did in fact reasonably rely on Defendants' promises.

116.    Defendants did not perform the promised acts.

117.    As a result, Plaintiff was harmed and Plaintiff's reliance on the Defendants' promises was a substantial factor in causing the harm.

118.    As a proximate result of the Defendants' actions, Plaintiff has been damaged in excess of the jurisdictional minimum of this Court, which will be proven at trial.

**SECOND CAUSE OF ACTION**

**CONCEALMENT**

**(Against all Defendants and DOES 1-10, inclusive)**

119.    Plaintiff hereby incorporates by reference each, every, and all of the allegations of this Complaint as though fully set forth herein.

120.    Defendants suppressed material facts and information of other facts that were likely to mislead Plaintiff for want of communication of those facts, which comprise concealment. Plaintiff was misled, defrauded and deprived of his legal rights.

121.    Plaintiff was harmed because the Defendants concealed certain information, including but not limited to the fact that Facebook would not be limited to people only in schools

1   and universities and that Facebook had secured significant financial investment.

2       122.    Defendants intentionally failed to disclose certain facts to Plaintiff, including the

3   fact that Facebook would not be limited to people only in schools and universities.

4       123.    Plaintiff did not know of the concealed facts.

5       124.    Defendants intended to deceive Plaintiff by concealing facts.

6       125.    Had the omitted information been disclosed, Plaintiff reasonably would have

7   behaved differently.

8       126.    Plaintiff was in fact harmed and Defendants' concealment was a substantial factor

9   in causing Plaintiff's harm.

10      127.    As a proximate result of the Defendants' actions, Plaintiff has been damaged in

11  excess of the jurisdictional minimum of this Court, which will be proven at trial.

12                          **THIRD CAUSE OF ACTION**

13                          **RESCISSION OF CONTRACT**

14                  **(Against all Defendants and DOES 1-10, inclusive)**

15      128.    Plaintiff re-alleges and incorporates by reference all prior paragraphs as though

16  fully set forth herein.

17      129.    Plaintiff seeks rescission of the 2008 contract. A contracting party has a right to

18  what it contracted for, and so has the right to rescind where he obtained something substantially

19  different from that which he is led to expect. (Civil Code §§ 1688, et seq.).

20      130.    With his consent given under lack of capacity to enter into an agreement, mistake

21  or by fraud, Plaintiff seeks rescission and declaratory relief (Civil Code § 1692).

22      131.    The 2008 Agreement is voidable or otherwise subject to rescission, with

23  restitution plus interest to Plaintiff, at Plaintiff's option because, without limitation: (i) any

24  consent given by Plaintiff to the agreement was given by mistake; and/or (ii) any consent given

25  by Plaintiff to the agreement was obtained by fraud exercised by Defendants; and/or (iii) any

26  consent given by Plaintiff to the agreement was obtained by duress, menace, or undue influence

27  exercised by Defendants (CA Civ Code § 1689 (b) (1) and § CA Civ Code 1567); and/or (iv) any

28  consideration for Plaintiff's obligations under the agreement fails and/or is entirely void due to

1    Plaintiff's lack of capacity to enter into an agreement.

2         132.   A contract entered into by someone entirely without understanding is void, not

3    merely voidable. Gibson v Westoby (1953) 115 CA2d 273, 276.

4         133.   Plaintiff asserts the right to rescind under "any other statute providing for

5    rescission." (Civil Code, §§ 1689(b)(7)).

6         134.   Plaintiff seeks any and all relief that is necessary to adjust the equities between

7    the parties and ensure restoration to the pre-contract status quo. (Civil Code, § 1692).

8         135.   As a proximate result of the Defendants' actions, Plaintiff has been damaged in

9    excess of the jurisdictional minimum of this Court, which will be proven at trial.

10                            **FOURTH CAUSE OF ACTION**

11                    **INTENTIONAL MISREPRESENTATION - FRAUD**

12                    **(Against all Defendants and DOES 1-10, inclusive)**

13        136.   Plaintiff re-alleges and incorporates by reference all prior paragraphs as though

14   fully set forth herein.

15        137.   Defendants intentionally made false statements of a material fact relating to its

16   business and the circumstances during both the 2006 promise and the July 4, 2008 Agreement.

17        138.   The Defendants knew the representations were false.

18        139.   The Defendants intended that the misrepresentation would induce the Plaintiff to

19   act on the misrepresentations.

20        140.   Plaintiff reasonably relied on the misrepresentations.

21        141.   Plaintiff was damaged by acting in reliance on the misrepresentation.

22        142.   Had Plaintiff known the true facts, it would not have entered into any agreements

23   with Defendants and Plaintiff would have acted differently.

24        143.   As a proximate result of Defendants' misrepresentations, Plaintiff has been

25   damaged in an amount excess of the jurisdictional minimum of this Court, which will be proven

26   at trial.

27        144.   Each of the Defendants knew a fraud was occurring. Notwithstanding their

28   knowledge of the fraudulent conduct, the Defendants, and each of them, engaged in the conduct,

1    hereinbefore described, which renders substantial assistance to, encouraged and/or aided and

2    abetted the fraud.

3         145.    In performing the acts set forth above, Defendants acted with oppression, fraud

4    and/or malice entitling Plaintiff to exemplary and punitive damages in an amount which will be

5    proven at trial.

6         146.    Further, on account of this fraud, the 2008 agreement should be rescinded.

7                          **FIFTH CAUSE OF ACTION**

8              **FRAUD IN CONTRACT FORMATION (Civil Code section 1572)**

9                  **(Against all Defendants and DOES 1-10, inclusive)**

10        147.    Plaintiff re-alleges and incorporates by reference all prior paragraphs as though

11   fully set forth herein.

12        148.    Defendants intentionally made false statements of a material fact relating to its

13   business and the circumstances preceding the July 4, 2008 Agreement which constitutes fraud.

14        149.    The Defendants knew the representations were false.

15        150.    The Defendants intended that the fraudulent misrepresentation would induce the

16   Plaintiff to act on the misrepresentations.

17        151.    Plaintiff reasonably relied on the misrepresentations.

18        152.    Plaintiff was damaged by acting in reliance on the misrepresentations.

19        153.    As a proximate result of the Defendants' actions, Plaintiff has been damaged in

20   excess of the jurisdictional minimum of this Court, which will be proven at trial.

21        154.    In addition, on account of the above, the 2008 Agreement should be rescinded.

22                         **SIXTH CAUSE OF ACTION**

23              **ACTIONABLE DECEIT (Civil Code section 1709)**

24                 **(Against all Defendants and DOES 1-10, inclusive)**

25        155.    Plaintiff re-alleges and incorporates by reference all prior paragraphs as though

26   fully set forth herein.

27        156.    The Defendants statements to Plaintiff constitute actionable deceit under Civil

28   Code section 1709.

157.   Plaintiff reasonably relied on the misrepresentations.

158.   Plaintiff was damaged by acting in reliance on the misrepresentations and Defendants are liable for such damages.

159.   As a proximate result of the Defendants' actions, Plaintiff has been damaged in excess of the jurisdictional minimum of this Court, which will be proven at trial.

160.   In addition, on account of the above, the 2008 Agreement should be rescinded.

<u>**SEVENTH CAUSE OF ACTION**</u>

**TRADEMARK INFRINGEMENT**

**(Against all Defendants and DOES 1-10, inclusive)**

161.   Plaintiff re-alleges and incorporates by reference all prior paragraphs as though fully set forth herein.

162.   The Faceparty Marks owned by Plaintiff have been continuously used since at least as early as 1998. Plaintiff has never authorized nor consented to the Defendant's use of any term which is the same as, is confusingly similar to, or constitutes a colorable imitation of the FACEPARTY Mark in commerce in connection with their products or services and with the 2008 Agreement rescinded, also the FACE Mark. .

163.   Defendants' actions, as alleged above, are likely to cause confusion, mistake or deception in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

164.   Plaintiff  is informed and it believes and, based thereon it alleges that Defendant's acts have been undertaken with full knowledge of Plaintiff's Marks and with the willful and deliberate intent to cause confusion, mistake and deception among members of the relevant public and to trade on the goodwill associated with the Marks or create reverse confusion.

165.   By reason of Defendant's acts, as alleged herein, Plaintiff will suffer damage to its business, reputation and goodwill and Defendant will make profits and sales it would not have made but for Defendant's conduct.

166.   Defendant's acts will cause irreparable and immediate injury to Plaintiff for which Plaintiff has no adequate remedy at law. Unless Defendant is restrained by this Court from continuing their unauthorized use of words and symbols that are confusingly similar to

1    Plaintiff's Marks, these injuries will continue to occur.

2        167.   As a proximate result of the Defendants' actions, Plaintiff has been damaged in

3    excess of the jurisdictional minimum of this Court, which will be proven at trial.

4    **EIGHTH CAUSE OF ACTION**

5    **FALSE DESIGNATION OF ORIGIN**

6    **(Against all Defendants and DOES 1-10, inclusive)**

7        168.   Plaintiff re-alleges and incorporates by reference all prior paragraphs as though

8    fully set forth herein.

9        169.   The FACEPARTY Marks and associated Trade Dress are owned by Plaintiff and

10   Plaintiff, or its predecessors in interest, have continuously used them in commerce for many

11   years. Plaintiff has never authorized or consented to the Defendant's use of the Marks or any

12   similar words or names in connection with their products nor has it consented to use of its Trade

13   Dress. This extends to the FACE Mark on the rescinding of the 2008 Agreement.

14       170.   Defendants' actions, as alleged above, are likely to cause confusion, mistake or

15   deception as to the affiliation, connection or association of the Defendants with Plaintiff, or as to

16   the origin, sponsorship or approval of Defendants' products or services by Plaintiff in violation

17   of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

18       171.   Plaintiff is informed and it believes and, based thereon it alleges that Defendant's

19   acts have been undertaken with full knowledge of Plaintiff's rights in and to Plaintiff's Marks

20   and Trade Dress and Trade Dress with the willful and deliberate intent to cause confusion,

21   mistake and deception among members of the relevant public and to trade on the goodwill

22   associated with the marks.

23       172.   By reason of Defendant's acts, as alleged herein, Plaintiff will suffer damage to its

24   business, reputation and goodwill and Defendant will realize profits and sales it would not have

25   made but for Defendant's conduct

26       173.   Defendant's acts will cause irreparable and immediate injury to Plaintiff for which

27   Plaintiff has no adequate remedy at law. Unless Defendant is restrained by this Court from

28   continuing their unauthorized use of words, symbols, and packaging that are confusingly similar

1   to the FACEPARTY Marks and Trade Dress. These injuries will continue to occur.

2       174.   As a proximate result of the Defendants' actions, Plaintiff has been damaged in

3   excess of the jurisdictional minimum of this Court, which will be proven at trial.

4       **NINTH CAUSE OF ACTION**

5       **TRADEMARK DILUTION (Under Cal. Bus. & Prof. Code §14247)**

6       **(Against all Defendants and DOES 1-10, inclusive)**

7       175.   Plaintiff re-alleges and incorporates by reference all prior paragraphs as though

8   fully set forth herein.

9       176.   The FACEPARTY trademark is distinctive and famous within the meaning of

10   Cal. Bus. & Prof. Code §14247 and within the UK.

11       177.   Defendants' use of the FACEBOOK trademark began after the FACEPARTY

12   trademark became famous.

13       178.   Defendants' continued use of the FACEBOOK trademark is likely to cause injury

14   to Plaintiff's business and reputation and the dilution of the distinctive quality of Plaintiffs'

15   famous FACEPARTY trademark in violation of Cal. Bus. & Prof. Code § 14247 and the laws of

16   the United Kingdom.

17       179.   Plaintiff has been, and will continue to be, damaged and irreparably harmed by

18   the actions of the Defendants, which will continue unless Defendants are enjoined by this Court.

19       180.   Plaintiff has no adequate remedy at law in that the amount of damage to Plaintiff's

20   business and reputation and the diminution of the goodwill of the FACEPARTY trademark is

21   difficult to ascertain with specificity. Plaintiff is therefore entitled to injunctive relief pursuant to

22   Cal. Bus. & Prof. Code § 14247 and the laws of the United Kingdom.

23       181.   The actions of Defendants described herein were and continue to be deliberate

24   and willful. Plaintiff is therefore entitled to recover damages in an amount to be determined at

25   trial, profits made by Defendants, and the costs of this action pursuant to Cal. Bus. & Prof. Code.

26       182.   In the UK, again dilution occurs through blurring or tarnishment of the reputation

27   of a well-known or famous trademark.

28       183.   The Faceparty mark has a reputation in the UK.

184.    The Facebook mark has similarity to the Faceparty mark and its use takes advantage and/or causes detriment to the distinctive character or repute of Plaintiff's mark.

185.    Defendants use of the Facebook mark is without due cause.

186.    As a proximate result of the Defendants' actions, Plaintiff has been damaged in excess of the jurisdictional minimum of this Court, which will be proven at trial.

## TENTH CAUSE OF ACTION

### COMMON LAW TRADEMARK INFRINGEMENT

### (Against all Defendants and DOES 1-10, inclusive)

187.    Plaintiff re-alleges and incorporates by reference all prior paragraphs as though fully set forth herein.

188.    By reason of Defendants' acts, as alleged herein, Plaintiff will suffer damage to its business, reputation and goodwill and Defendant will realize profits and sales it would not have made but for Defendant's conduct.

189.    The above-described acts of Defendant constitute common law trademark, trade name, and trade dress infringement. Such acts will cause and will continue to cause irreparable and immediate injury to Plaintiff for which Plaintiff has no adequate remedy at law. Unless Defendant is restrained by this Court from continuing the acts alleged herein, these injuries will continue to occur.

190.    On information and belief, the foregoing acts of Defendant are oppressive, fraudulent, willful and malicious in that they have been undertaken with a conscious disregard of Plaintiffs' rights and with a desire to injure Plaintiff's business and to improve its own.

191.    As a proximate result of the Defendants' actions, Plaintiff has been damaged in excess of the jurisdictional minimum of this Court, which will be proven at trial.

## ELEVENTH CAUSE OF ACTION

### PROMISSORY ESTOPPEL

### (Against all Defendants and DOES 1-10, inclusive)

192.    Plaintiff re-alleges and incorporates by reference all prior paragraphs as though fully set forth herein.

193.   With the 2008 Agreement having been rescinded, previous promises and agreements come back into force, including the 2006 promise by Defendant/s never to trade outside of schools or universities, which immediately results in a new breach of the promise.

194.   In justifiable and highly detrimental reliance on the promises made by Defendants, Plaintiff did in fact act in reliance.

195.   On the basis of said representations by Defendants, Plaintiff elected not to pursue available options for Faceparty, as Plaintiff believed Defendants' representations that Facebook would be limited to only people in schools and universities.

196.   As a result of the promises made by Defendants, combined with the justifiable and detrimental reliance by Plaintiff on said promises, Defendants were thereafter forever estopped under well-established principles of equity from pursuing Facebook outside the school and university context.

197.   Nonetheless, Defendants instead did in fact pursue Facebook outside the school and university context, a clear and unambiguous deviation from Defendants' earlier representations.

198.   The unconscionable pursuits of Facebook therefore by Defendants operated as a unilateral repudiation of promise by one of the parties thereto, and was neither agreed to nor acquiesced in nor ratified by Plaintiff.

199.   As a result of the promises made by Defendants on which Plaintiff justifiably and detrimentally relied, Plaintiff has suffered additional loss of income and the unanticipated continued threat of additional losses and harms.

200.   As a result of the fraudulent and shamelessly inequitable conduct of Defendants, Plaintiff is entitled to the value of the benefit promised, represented and agreed by Defendants. Plaintiff is additionally entitled to compensation for the amounts inequitably and unlawfully extracted by Defendants pursuant to the agreement and such other relief as is required and appropriate to do equity and provide redress for Defendants' inequitable conduct.

201.   As a proximate result of the Defendants' actions, Plaintiff has been damaged in excess of the jurisdictional minimum of this Court, which will be proven at trial.

**TWELFTH CAUSE OF ACTION**

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

**(Against all Defendants and DOES 1-10, inclusive)**

202.    Plaintiff re-alleges and incorporates by reference all prior paragraphs as though fully set forth herein.

203.    Pursuant to California Civil Jury Instructions (CACI) 1620, entitled "Negligent Infliction of Emotional Distress", Defendants' conduct caused Plaintiff to suffer serious emotional distress. Defendants' negligent and wrongful conduct, and/or omissions, were a substantial factor in causing Plaintiff to suffer serious emotional distress.

204.    Emotional distress includes suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame, all of which Plaintiff was wrongfully forced to undergo due to the Defendants' wrongful conduct.

205.    Serious emotional distress exists if an ordinary, reasonable person would be unable to cope with it, which in this case includes the standard of an ordinary, reasonable person under like circumstances such as Plaintiff.

206.    As a direct and proximate result of the acts and omissions detailed herein, Plaintiff suffered and continues to suffer serious, severe, substantial and enduring psychological, emotional and mental injuries.

207.    By reason of the foregoing, Defendants are liable for, and Plaintiff is entitled to recover from them, his general, special, actual and compensatory damages, including, but not limited to, his necessary past, present and future medical and related expenses, as well as mental, emotional and physical pain and suffering, as proven at time of trial.

208.    As a proximate result of the Defendants' actions, Plaintiff has been damaged in excess of the jurisdictional minimum of this Court, which will be proven at trial.

**THIRTEENTH CAUSE OF ACTION**

**UNFAIR BUSINESS PRACTICES (under Cal. Bus. & Prof. Code §17200)**

**(Against all Defendants and DOES 1-10, inclusive)**

209.    Plaintiff re-alleges and incorporates by reference all prior paragraphs as though

1    fully set forth herein.

2        210.    The Defendants' actions described above show that Defendants have engaged in

3    unlawful, unfair or fraudulent business acts or practices in violation of Cal. Bus. & Prof. Code

4    §17200.

5        211.    As a direct result of the unfair competition and unfair business practices, Plaintiff

6    has been damaged in excess of the jurisdictional minimum of this Court, which will be proven at

7    trial.

8                          **FOURTEENTH CAUSE OF ACTION**

9    **INTENTIONAL INTERFERENCE with PROSPECTIVE ECONOMIC ADVANTAGE**

10                    **(Against all Defendants and DOES 1-10, inclusive)**

11        212.    Plaintiff re-alleges and incorporates by reference all prior paragraphs as though

12    fully set forth herein.

13        213.    Plaintiff and Faceparty had an economic relationship with its 8,400,000+

14    customers, with the probability of future economic benefit;

15        214.    The Defendant knew of the relationship;

16        215.    The Defendant engaged in wrongful conduct in order to disrupt the relationship or

17    with knowledge that disruption was substantially certain to occur;

18        216.    As a result of Defendants' conduct, the relationship was actually disrupted; and

19        217.    Because of the disruption, Plaintiff suffered economic harm.

20        218.    As a proximate result of the Defendants' actions, Plaintiff has been damaged in

21    excess of the jurisdictional minimum of this Court, which will be proven at trial.

22                         **FIFTEENTH CAUSE OF ACTION**

23                         **UNJUST ENRICHMENT**

24                    **(Against all Defendants and DOES 1-10, inclusive)**

25        219.    Plaintiff re-alleges and incorporates by reference all prior paragraphs as though

26    fully set forth herein.

27        220.    Unjust enrichment occurs when a party is enriched at the expense of another in

28    circumstances that the law sees as unjust, including where an agreement has been ruled

1   unenforceable due to incapacity or where fraud has occurred. Where a party is unjustly enriched,

2   the law imposes an obligation upon the recipient to make restitution.

3        221.    Defendants clearly have been unjustly enriched at the expense of Plaintiff.

4        222.    By reason of the foregoing, said Defendants, and each of them, are liable for, and

5   Plaintiff is entitled to recover damages, in an amount exceeding the minimum jurisdictional

6   limits of this Court and as proven at time of trial.

7

8                              **PRAYER FOR RELIEF**

9   WHEREFORE, Plaintiff prays judgment against Defendants as hereinafter set forth.

10       1.      For actual damages in the principal amount of not less than $5,000,000.00.

11       2       For other general and special damages according to proof.

12       3       For an award of prejudgment interest at the legal rate, and an award of post-

13  judgment interest until the judgment is fully satisfied.

14       4       For restitution.

15       5       For compensatory damages.

16       6       For an award of reasonable attorneys' fees incurred herein.

17       7       For punitive and exemplary damages.

18       8       For expenses and costs of suit incurred.

19       9       For such other and further relief as the Court may deem proper.

20

21
Dated:  November 24, 2020
22

23                                     ANDREW DAVID BAMFORTH
                                       Plaintiff, In Pro Per
24

25

26

27

28

                                        32
                                     COMPLAINT