UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW DAVID BAMFORTH,<br><br>Plaintiff,<br><br>v.<br><br>FACEBOOK, INC., et al.,<br><br>Defendants. | Case No. 20-cv-09483-DMR<br><br>**ORDER ON MOTION TO DISMISS**<br><br>Re: Dkt. No. 17 |

Plaintiff Andrew Bamforth, representing himself, filed this case in the San Mateo County Superior Court. *See* Docket No. 1, Notice of Removal. He alleges trademark and copyright infringement claims against Defendant Facebook, Inc. and Mark Zuckerberg, as well as various related state law claims. Defendants removed the case under federal question jurisdiction. They now move to dismiss Plaintiff's first amended complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). [Docket Nos. 17, Motion to Dismiss ("Mot."); 36, Reply.] Plaintiff opposes. [Docket No. 29, Opposition ("Opp.").] The court held a hearing on July 8, 2021.

For the reasons stated below, Defendants' motion is granted.

**I.   BACKGROUND**

The following facts are alleged in the first amended complaint. Notice of Removal, Ex. A ("FAC").[1] Plaintiff is a citizen and resident of the United Kingdom. *Id.* ¶ 1. Defendants own the social media platform Facebook.

Plaintiff alleges that he created the "world's first social networking website," which launched as "Faceparty" in 2000.[2] FAC ¶ 7. Between 2000 and 2008, Faceparty was operated by

---

[1] Exhibit A to the Notice of Removal contains both Plaintiff's original complaint and the FAC. The FAC begins at ECF page number 29.

[2] The complaint alleges that the website operated under different names before that time.

CIS Internet Ltd. ("CIS"), of which Plaintiff was the sole owner, shareholder, and operator. *Id.* ¶ 8. According to Plaintiff, Faceparty was a "key pioneer of the internet today, from a social perspective." *Id.* ¶ 15. Allegedly, Faceparty was "so unique and popular" that, as early as 2001, it became the target of copycat websites that cloned Faceparty's unique features, such as software-free instant messaging, a friends list, and photo sharing. *Id.* ¶ 17. The copycat websites also used Faceparty's blue and white color scheme and operated under similar names, such as "Facemates" and "Faceclub." *Id.* Faceparty eventually registered its trademarks in the United Kingdom and United States, among other countries. *Id.* ¶¶ 18-19.

In 2004, Defendants created Facebook, which Plaintiff alleges was "highly similar" to Faceparty and used many of Faceparty's unique features. FAC ¶ 23. For example, Facebook also had a blue and white color scheme and used the word "Face" in its name. *Id.* Plaintiff asserts that he first became aware of Facebook in early 2006 when he began receiving letters from Facebook users that were intended for Facebook. *Id.* ¶ 25. Plaintiff sent Defendants a cease and desist letter demanding that they change the name of their social media platform and informing Defendants of his registered trademarks. *Id.* ¶ 26. Allegedly, Plaintiff spoke directly to Zuckerberg, who represented that Facebook was "just a school project." *Id.* ¶¶ 27-28. The platform was initially only available to college students. *Id.* ¶ 31. Zuckerberg "pleaded" to be allowed to keep his website's name and assured Plaintiff that he would never use the platform outside of a school setting. *Id.* ¶ 28. Plaintiff agreed to not take legal action and allowed Defendants to keep using the word "Face" on its platform, on the conditions that Defendants would not offer Facebook outside of schools or outside of the United States. *Id.* According to Plaintiff, this discussion between the parties took place in 2006, although they did not memorialize their agreement in writing. *See id.* ¶ 26.

Plaintiff asserts that Defendants initially complied with their 2006 promise to not expand beyond college students or the United States. FAC ¶ 32. However, in September 2006, Defendants opened up their platform to the general public. *Id.* ¶ 34. Plaintiff alleges that as soon as Facebook launched in the United Kingdom, Faceparty "began to suffer increased and significant brand confusion." *Id.* ¶ 37. The cost of operating Faceparty "significantly increased"

and the platform began to struggle to survive financially. *Id.* ¶ 67. Plaintiff became a target of opportunists looking to capitalize on his success, mistaking him and his platform for Defendants' much more lucrative enterprise. *See id.* ¶ 68. In late 2006 to early 2007, Plaintiff's own employees began believing that Plaintiff actually made tens of millions of dollars a year and began refusing to work. *Id.* ¶ 72. They also began looting company property and Plaintiff's personal credit cards. *Id.* ¶ 74. Around the same time, Plaintiff's father was diagnosed with cancer and needed proton therapy. *Id.* ¶ 75. Plaintiff had previously arranged to pay for his father's treatment, but the money he set aside for this purpose was stolen by disgruntled staff. *Id.* Without the treatment, Plaintiff's father died. *Id.* By late 2007, Plaintiff's business was faltering, he was millions of pounds in debt, and he was the target of multiple assaults and even death threats from creditors. *Id.* ¶ 78. A bank foreclosed on Plaintiff's home and took the remainder of his savings. *Id.* ¶ 79. Plaintiff alleges that all of these events were largely the result of the brand confusion between his company and Facebook. *Id.* ¶ 77.

Plaintiff alleges that in March 2008, he had a "nervous breakdown and was no longer able to function cognitively on a day-to-day basis and began to make irrational and poor decisions." FAC ¶ 84. Plaintiff sought treatment at the Priory Hospital and was diagnosed with symptoms of depression, anxiety, and Post-Traumatic Stress Disorder ("PTSD"). *Id.* Plaintiff's business partner also suffered a severe mental health decline as a result of the stress caused by the brand confusion, developed PTSD that rendered him unable to work, and eventually became homeless. *Id.* ¶ 87. In 2008, Plaintiff began suffering auditory hallucinations that include "machine-gun-like" intrusive voices. *Id.* ¶ 88. He lost the ability to speak coherently and was arrested on three occasions because of his "incoherent ranting." *Id.* Plaintiff asserts that he suffered from a mental disability from 2006 to 2018, during which time he was "repeatedly conned" by people who took advantage of his mental state. *Id.* ¶ 89.

By June 2008, Plaintiff had been contemplating suing Defendants for breaching their 2006 promises[3] to not operate in the United Kingdom or outside of schools. FAC ¶ 90. According to

---

[3] The FAC says "2005" but the court assumes this is an error based on the other allegations summarized above.

3

Plaintiff, Defendants' in-house attorney Jim Midgal "bypassed Plaintiff's attorney" and directly approached Plaintiff about the planned legal proceedings. *Id.* Midgal told Plaintiff that it would be impossible for him to win a trademark infringement case against Defendants. *Id.* ¶ 94. Midgal said that he was "acting in Plaintiff's best interests" and proposed that Defendants pay Plaintiff $800,000 to settle his trademark infringement claims and transfer his "FACE" trademark to Defendants. *Id.* ¶¶ 96, 98. Plaintiff alleges that the money was insufficient to compensate him for the losses he incurred due to Defendants' conduct, but at the time he was so ill that he believed Midgal's statements. *Id.* ¶ 95. Thus, on July 4, 2008, Plaintiff signed an agreement on behalf of CIS that assigned the "FACE" trademark to Defendants and released any claims against Defendants relating to their use of the Facebook trademarks. *Id.* ¶ 100; *see* Docket No. 19, Declaration of Holly Gaudreau ("Gaudreau Decl."), Ex. A ("2008 Agreement"). Plaintiff alleges that, because of his disability, he did not understand what he was doing when he entered into the 2008 Agreement. *Id.* ¶ 102. He also represents that CIS actually had no authority to sell its rights in the Face trademark, since it had already sold all of its trademarks to a different company, Anarchy Towers Ltd. ("Anarchy") in February 2008, an agreement that was formalized in writing in March 2008. *Id.* ¶¶ 83, 102(a).

Plaintiff asserts that he was manipulated into signing the 2008 Agreement and that Midgal acted in bad faith throughout that negotiation. FAC ¶¶ 100, 105. He also contends that the 2008 Agreement is not valid because he suffered from a mental disability and did not understand what he was signing. *See id.* ¶¶ 99-105. Plaintiff only began to understand that Defendants' conduct was unlawful once he recovered from his mental disability in October 2018. *Id.* ¶ 109. Plaintiff asserts that he could not have filed his lawsuit until 2020 because his mental disability lasted from 2006 until 2018.

Plaintiff brings claims for promissory fraud; concealment; rescission of contract; intentional misrepresentation – fraud; fraud in contract formation; actionable deceit; trademark infringement; false designation of origin; trademark dilution; common law trademark infringement; promissory estoppel; negligent infliction of emotional distress; unfair business practices; intentional interference with prospective economic advantage; and unjust enrichment.

4

## II. DEFENDANTS' REQUEST FOR JUDICIAL NOTICE

"The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.

Defendants request that the court take judicial notice of various documents, including the 2008 Agreement, a trademark assignment executed by Plaintiff in his capacity as the director of CIS, an email chain between Plaintiff and Jim Midgal, various records from the U.S. Patent & Trademark Office, certain SEC filings, a number of news articles, and some of Plaintiff's state court filings. As discussed further below, the court may consider the 2008 Agreement under the incorporation by reference document. The court does not rely on any of the other documents submitted as part of Defendants' request for judicial notice in reaching its decision.

Accordingly, the request for judicial notice is denied as moot.

## III. LEGAL STANDARDS FOR RULE 12(B)(6) MOTIONS[4]

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted), and may dismiss a claim "only where there is no cognizable legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)) (quotation marks omitted). A claim has facial plausibility when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). In other words, the facts alleged must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of

---

[4] Although Defendants also raise arguments under Rule 12(b)(1), it is not necessary to reach these arguments because the court dismisses all of the claims under Rule 12(b)(6).

a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Lee v. City of L.A.*, 250 F.3d 668, 679 (9th Cir. 2001), overruled on other grounds by *Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

As a general rule, a court may not consider "any material beyond the pleadings" when ruling on a Rule 12(b)(6) motion. *Lee*, 250 F.3d at 688 (citation and quotation marks omitted). However, "a court may take judicial notice of 'matters of public record,'" *id*. at 689 (citing *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986)), and may also consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading," without converting a motion to dismiss under Rule 12(b)(6) into a motion for summary judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith*, 307 F.3d at 1125-26. The court need not accept as true allegations that contradict facts which may be judicially noticed. *See Mullis v. U.S. Bankr. Court*, 828 F.2d 1385, 1388 (9th Cir. 1987).

Although pro se pleadings are liberally construed and held to a less stringent standard than those drafted by lawyers, *see Haines v. Kerner*, 404 U.S. 519, 520-21 (1972), a complaint, or portion thereof, should be dismissed for failure to state a claim if it fails to set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007); *see also* Fed. R. Civ. P. 12(b)(6). "[A] district court should not dismiss a pro se complaint without leave to amend unless it is absolutely clear that the deficiencies of the complaint could not be cured by amendment." *Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012) (quotations omitted).

## IV. DISCUSSION

Defendants move to dismiss the FAC on numerous grounds. For the reasons explained below, the court holds that Plaintiff's state law claims are barred by the applicable statutes of limitation and are not subject to statutory or equitable tolling. It also holds that Plaintiff's federal trademark claims are barred by the 2008 Agreement. Since the court dismisses Plaintiff's complaint on these grounds, it is not necessary to reach Defendants' remaining arguments.

**A.     State Law Claims**

   **1.     Statute of Limitations**

A party may raise a statute of limitations defense on a motion to dismiss "[i]f the running of the statute is apparent on the face of the complaint." *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980); *see also Yamauchi v. Cotterman*, 84 F. Supp. 3d 993, 1004 (N.D. Cal. 2015) ("A plaintiff fails to state a claim, and therefore dismissal is appropriate, where his failure to comply with the applicable statute of limitations is evident from the allegations of the complaint.").

The court first examines whether Plaintiff failed to comply with the applicable statute of limitations for each of his state law claims, then turns to the issue of whether any of the stale claims are subject to tolling.

   **a.     Fraud and Unjust Enrichment**

Plaintiff raises several fraud claims, including promissory fraud, intentional misrepresentation – fraud, fraud in contract formation, actionable deceit, and concealment. Under California law, the statute of limitations for fraud actions is three years. Cal. Civ. Proc. Code § 338(d). A fraud claim "is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." *Id.* Plaintiff also brings a claim for unjust enrichment based on the same allegations as his fraud claims, which is therefore also governed by section 338(d). *Swingless Golf Club Corp. v. Taylor*, 679 F. Supp. 2d 1060, 1069 (N.D. Cal. 2009).

All of Plaintiff's allegations regarding Defendants' fraudulent conduct relate to events that occurred between 2006 (when Defendants allegedly promised not to expand beyond colleges or the United States) and 2008 (when Defendants allegedly misrepresented facts to induce Plaintiff to sign the 2008 agreement). Accordingly, it is apparent on the face of the complaint that the statute of limitations has run on Plaintiff's fraud and unjust enrichment claims.

   **b.     Rescission**

Plaintiff seeks to rescind the 2008 Agreement based on mistake, fraud, duress, undue influence, and lack of capacity. The statute of limitations for bringing a rescission claim is four

years. Cal. Civ. Proc. Code § 337(c). The statute of limitations "begins to run from the date upon which the facts that entitle the aggrieved party to rescind occurred." "Where the ground for rescission is fraud or mistake, the time shall not begin to run until the discovery by the aggrieved party of the facts constituting the fraud or mistake." *Id.* All the allegations underlying Plaintiff's recission claim relate to Defendants' conduct in negotiating the 2008 agreement, which is more than 4 years before Plaintiff filed this case in October 2020. Plaintiff's claim for rescission is therefore well outside the four-year statute of limitations.

Plaintiff specifically invokes the discovery rule as set forth in section 337(c), arguing that he did not discover the facts constituting fraud or mistake until October 10, 2018. Opp. at 12; *see* FAC ¶ 68; *see also Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1109 (1988) ("The discovery rule provides that the accrual date of a cause of action is delayed until the plaintiff is aware of her injury and its negligent cause."). Plaintiff's allegations regarding the time at which he allegedly discovered the grounds for rescission are the same allegations that support his various tolling arguments, which are examined below. For the same reasons explained in that section, Plaintiff has not sufficiently invoked the discovery rule.

### c. Promissory Estoppel

Plaintiff brings a claim for promissory estoppel, asserting that Defendants broke their 2006 promise to never expand beyond schools. *See* FAC ¶ 193. Plaintiff claims that because of Defendants' promise, he elected to not pursue his legal remedies and suffered damages as a result. The statute of limitations for a promissory estoppel claim based on an oral promise is two years. Cal. Civ. Proc. Code § 339(1); *Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism*, 6 Cal. App. 5th 1207, 1224 (2016), *aff'd*, 4 Cal. 5th 637 (2018).

Because the factual basis for Plaintiff's promissory estoppel claim arose in 2006, significantly more than 2 years before he brought this case, it is barred by the applicable statute of limitations.

### d. Trademark Dilution

Plaintiff asserts a trademark dilution claim under Cal. Bus. & Prof. Code § 14247. He alleges that this claim arose when Facebook began using the "FACEBOOK" trademark after the

8

"FACEPARTY" trademark became famous and therefore was likely to cause dilution of Plaintiff's trademark. FAC ¶¶ 177-78. The statute of limitations for California trademark dilution claims is four years. *V.V.V. & Sons Edible Oils Ltd. v. Meenakshi Overseas LLC*, 2016 WL 1268008, at *11 (E.D. Cal. Mar. 31, 2016). Plaintiffs' allegations make clear that he knew about Defendants' use of the "FACEBOOK" trademark as early as 2006 and was aware then that members of the public confused Facebook with Faceparty. FAC ¶ 25.

Since Plaintiff's state law dilution claim is based on events that began in 2006, the four-year statute of limitations has passed.

### e. Common Law Trademark Infringement

Plaintiff also brings a claim for common law trademark infringement. Some courts have applied a two-year statute of limitations to common law trademark infringement claims by analogy to tort claims. *See V.V.V. & Sons Edible Oils Ltd.*, 2016 WL 1268008, at *10. Plaintiff asserts that the statute of limitations is four years under Cal. Civ. Proc. Code § 343, which applies a four-year statute of limitations for claims where no other statute of limitations apply.

Regardless of whether a two-year or four-year statute of limitations applies, Plaintiff's claims are untimely since the events complained of took place between 2006 and 2008.

### f. Unfair Competition Law

Plaintiff alleges that Defendants' actions constitute unlawful, unfair, or fraudulent business practices in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq*. The UCL has a four-year statute of limitations. Cal. Bus. & Prof. Code § 17208. As with Plaintiff's other claims, the events underlying this claim occurred around 2006 and at latest 2008.

The UCL claim is therefore untimely.

### g. Negligent Infliction of Emotional Distress

According to Plaintiff, Defendants' unlawful conduct caused him "serious emotional distress." FAC ¶ 203. The statute of limitations for negligent infliction of emotional distress ("NIED") is two years. Cal. Civ. Proc. Code § 335.1. The statute begins running "when the plaintiff suffers severe emotional distress as a result of outrageous conduct by the defendant."

9

*Soliman v. CVS RX Servs., Inc.*, 570 F. App'x 710, 711 (9th Cir. 2014) (applying California law). Plaintiff alleges that he had a mental breakdown as a result of Defendants' actions in early 2008. *See* FAC ¶ 84. His NIED claim based on those allegations is plainly untimely.

Plaintiff again specifically invokes the discovery rule to argue that this claim did not accrue until much later because of his alleged mental incapacitation. Opp. at 15-16. Plaintiff's argument regarding the discovery rule rests on the same allegations that support his various tolling arguments, as examined further below, and fails for the same reason.

### h. Intentional Interference with Prospective Economic Advantage

Plaintiff alleges that Defendants interfered with the economic relationship he and Faceparty had with its customers and that Plaintiff suffered harm as a result. FAC ¶¶ 213-17. This claim appears to be based on Defendants' decision to launch Facebook in the United Kingdom, which happened around 2006. *See id.* ¶¶ 34-37. The statute of limitations for a tortious interference with prospective economic advantage is two years. *See R Power Biofuels, LLC v. Chemex LLC*, No. 16-cv-00716-LHK, 2017 WL 1164296, at *12 (N.D. Cal. Mar. 29, 2017).

Since Defendants' allegedly unlawful actions took place about 14 years before the filing of this complaint, this claim is also untimely.

### 2. Plaintiff's Tolling Arguments

Plaintiff asserts that his claims are timely because they are all subject to statutory tolling under California Code of Civil Procedure § 352 as well as the doctrine of equitable tolling.

### a. Cal. Civ. Proc. Code § 352

Plaintiff argues that his state law claims are timely because they are subject to statutory tolling. California law provides that the statute of limitations for certain claims (which include all of Plaintiff's state law claims) is tolled when a person "lack[s] the legal capacity to make decisions." Cal. Civ. Proc. Code § 352(a). In order to invoke tolling under this statute, a plaintiff must be "incapable of caring for his or her property or transacting business or understanding the nature or effects of his or her acts . . . ." *Alcott Rehab. Hosp. v. Superior Ct.*, 93 Cal. App. 4th 94, 101 (2001) (citation omitted) (cleaned up). The crux of the inquiry is "whether the allegedly insane plaintiff is sufficiently aware of the nature or effects of his acts to be able to comprehend

such business transactions as the hiring of an attorney and the instigation of a legal action." *Hsu v. Mt. Zion Hosp.*, 259 Cal. App. 2d 562, 575 (1968). Tolling under section 352(a) lasts only "until the plaintiff is restored to sanity." *Feeley v. S. Pac. Transportation Co.*, 234 Cal. App. 3d 949, 952 (1991).

The standard for pleading continuous lack of capacity under section 352(a) is high, since "[e]ven a person adjudged mentally ill *for commitment by a court* may nevertheless be capable of transacting business and carrying out [his] affairs." *Est. of Stern v. Tuscan Retreat, Inc.*, 725 F. App'x 518, 522 (9th Cir. 2018) (cleaned up) (emphasis in original); *see Hsu*, 259 Cal. App. 2d at 572-73 ("[A] person who is adjudged mentally ill and in need of hospital treatment . . . may nevertheless be capable of transacting business and carrying out his affairs, either during occasional lucid intervals or throughout his hospitalization.").

Reviewing the operative complaint, Plaintiff's allegations relating to his mental incapacity are sparse. He asserts a period of mental disability from "2006 through 2018." FAC ¶ 89. While he describes some details around 2008, such as hearing voices, there are practically no details about Plaintiff's mental state between 2008 and 2018, when he allegedly recovered. The FAC only states that Plaintiff initiated psychotherapy care in 2006 and continued treatment for more than a decade. FAC ¶ 108. There are no allegations regarding the level and extent of care that Plaintiff received during this decade or any other allegations that would plausibly indicate he was too disabled to discover Defendants' wrongful conduct for over 10 years. *See Quinones v. Cty. of Orange*, 2020 WL 5289923, at *4 (C.D. Cal. July 15, 2020) (stating that "vague[] gestures at the existence of a mental condition" are insufficient to state a claim for tolling under section 352(a)).

With his opposition, Plaintiff filed various declarations and letters that purport to provide more facts about his alleged disability. The facts contained in these papers are not alleged or alluded to in the FAC and so the court cannot consider them on a motion to dismiss. The court discusses the assertions made by Plaintiff in his opposition papers, as well as his proposed sur-reply and supporting declarations (addressed below), solely for the purpose of assessing whether amendment of the complaint would be futile. Having reviewed those materials for that purpose, the court concludes that even if the various statements were alleged in the FAC, they are not

11

sufficient to plead a period of mental incapacity lasting over a decade.

Plaintiff's declaration includes generalized assertions such as "[f]rom 2006 until sometime after 2018 I was not capable of caring for my property or transacting business" and "it was sometime in 2006 when I ceased to trust my own opinion, mind and beliefs." These are conclusory and provide no factual detail about the twelve-year period Plaintiff alleges he was disabled. *See* Docket No. 32, Declaration of Andrew Bamforth ("Bamforth Decl.") ¶¶ 42-43.

Plaintiff also submitted a letter written by Dr. Gary Jackson, a psychiatrist who treated Plaintiff from 2006 until 2019. Bamforth Decl., Ex. 17. Dr. Jackson describes Plaintiff's mental state in 2007 and 2008 as "distracted, agitated, [and] anxious." He opined that Plaintiff's judgment was "likely impair[ed]" and he had diminished ability to run his business. Dr. Jackson wrote that he saw Plaintiff less frequently from 2010 to 2015, and during those visits Plaintiff "seemed to still be struggling to gain an understanding of the events of the previous years (the problems with and then failure of [his] Faceparty business) . . . ." He concluded that Plaintiff seems to have finally "come through" in 2018 and is now no longer in need of psychiatric treatment. Dr. Jackson's letter suffers from the same deficiencies as the complaint. To begin with, it does not account for the entire period of alleged incapacity. Dr. Jackson's statements regarding Plaintiff's mental state are also vague and conclusory and contain few factual details. For example, he says that Plaintiff's ability to run his business was "likely impaired," but does not describe how Plaintiff's impairment presented on a day-to-day basis. His statement falls far short of supporting Plaintiff's allegation that he was "*incapable* of caring for his or her property or transacting business or understanding the nature or effects of his or her acts . . . ." *Alcott Rehab. Hosp.*, 93 Cal. App. 4th at 101 (emphasis added). Thus, Dr. Jackson's letter, even if it were attached to the complaint, would not provide sufficient detail to plead disability under section 352(a).

On June 30, 2021, three months after Defendants filed their reply and just over a week before the hearing, Plaintiff filed a motion for leave to file a sur-reply. [Docket No. 43.] He argues that Defendants "manipulated and twisted Dr. Jackson's words" in their reply and he must "un-do this damage" with the "clarified" testimony of Dr. Jackson. *Id.* at 2. He attaches another

12

declaration from Dr. Jackson to the motion. *Id.*, Ex. 1. Plaintiff explains that he did not file the motion earlier because Dr. Jackson retired in May 2021 and was on vacation afterward. *Id.* The court denies the motion. First, Plaintiff's purported reason for the delay is because Dr. Jackson retired in May 2021 and then went on vacation, during which time he was unreachable. However, Defendants filed their reply on March 25, 2021. Plaintiff had over a month before Dr. Jackson's retirement to seek the information he needed to file a sur-reply. Second, as explained above, the court cannot consider factual evidence on a motion to dismiss under Rule 12(b)(6). The only reason Plaintiff offers for the necessity of filing a sur-reply is to provide evidence the court cannot consider. Therefore, the motion is moot.

Even if the court permitted the sur-reply and even if the court could consider Dr. Jackson's revised letter, the factual information in that letter is still insufficient to plead continuous incapacity from 2006 to 2018. Dr. Jackson does not describe the level of treatment he provided Plaintiff, including whether Plaintiff ever needed medications or hospitalization because of his mental incapacitation. Any specific events described by Dr. Jackson all appear to have occurred in the 2006-2008 time period. There are no non-conclusory, non-generalized statements about Plaintiff's mental state between 2008 and 2018. For example, Dr. Jackson writes that during that period, Plaintiff initially struggled with "a mixed anxiety and depressive disorder," exhibited PTSD symptoms, "struggled heavily with concentration," was "a little but noticeably paranoid," and "found it difficult to make decisions." *Id.*, Ex. 1 ¶¶ 7-9. Dr. Jackson also states that he "cannot recall a session from 2006 to 2018 during which Mr. Bamforth demonstrated an ability to consistently make rational decisions." *Id.* ¶ 24. Dr. Jackson provides some examples of Plaintiff's allegedly disabling condition, including hearing voices, but the examples are generalized and undated. *See, e.g., id.* ¶ 14. Dr. Jackson also states in conclusory fashion that Plaintiff was not capable of transacting business at any time between 2006 and 2018. *Id.* ¶ 38(d). It is entirely unclear what Dr. Jackson means by "transacting business," including whether Plaintiff was capable of managing his affairs with assistance from others. As explained below, an allegation that Plaintiff was unable to handle his affairs on his own is insufficient to plead tolling under section 352(a).

To the extent that Plaintiff argues that section 352(a) tolling applies when people are incapable of caring for property or transacting business *by themselves*, Plaintiff is incorrect. *See* Bamforth Decl. ¶ 35 ("Defendants appear to draw the wrong conclusions as to what I do *personally* and what is done in my name." (emphasis in original)). Section 352(a) tolling does not apply if the person can manage affairs with the assistance of others. "[T]he standard is whether a person is 'incapable of caring for [her] property,' etc., not whether she can operate entirely by herself." *Est. of Stern* v, 725 F. App'x at 522–23 (internal quotation omitted); *see also Hsu*, 259 Cal. App. 2d at 576 (agreeing with the trial court that "be[ing] able to comprehend such business transactions as the hiring of an attorney and the instigation of a legal claim" defeats a claim for legal incapacity under section 352(a)). Plaintiff's allegations and evidentiary submissions support that he was able to handle his business and property with the assistance of others. *See* FAC ¶ 90 (stating that Plaintiff had retained an attorney); Bamforth Decl. ¶ 35 (Plaintiff asserts that he has staff that "do work under my name or on my behalf"), ¶ 38 (Plaintiff admits that he hired an attorney and attended remote hearings as part of a different legal proceeding); Docket No. 33, Declaration of Andrew Broadhurst ("Broadhurst Decl.") ¶¶ 6-11 (Plaintiff hired help to look after his property from mid-2017 until October 2018); Docket No. 31, Declaration of Linda Aldous ("Aldous Decl.") ¶¶ 1-21 (affirming that Plaintiff hired accountant services from at least 2008, when CIS was still in operation). Being able to conduct business with the assistance of other people is inconsistent with a claim of disability under section 352(a).

Finally, there is a glaring inconsistency in Plaintiff's allegations. On the one hand, Plaintiff alleges that he was totally incapacitated from 2006 until 2018 and could not transact any kind of business during that entire time period. On the other hand, in order to get around Defendants' argument that Plaintiff released his claims in the 2008 Agreement, Plaintiff also asserts that in February and March 2008, he (as the sole owner and shareholder of CIS) transferred the intellectual property rights to Anarchy, a company that is also solely owned and operated by him. *See* FAC ¶¶ 83, 102(a); Opp. at 21. Thus, Plaintiff alleges both that he was too disabled to conduct business between 2006 and 2018 *and* that he was able to conduct a valid transaction that renders the 2008 Agreement ineffective. At the hearing, Plaintiff was not able to offer a

14

satisfactory explanation that reconciles those contradictory statements.[5] Plaintiff's inconsistent statements make his allegations regarding his mental incapacity implausible.

In sum, Plaintiff's allegations in the FAC relating to his mental incapacity are conclusory and inadequate to plead tolling under section 352(a) and are directly contradicted by other allegations. None of the additional assertions Plaintiff made in his opposition, improper sur-reply, or at the hearing would fix these deficiencies for the reasons explained above. Accordingly, it would be futile to allow Plaintiff to amend his complaint on this point.

### b.     Equitable Tolling

Plaintiff also argues that the statutes of limitations for his various claims should be equitably tolled due to his medical conditions. The party invoking "equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way." *Kwai Fun Wong v. Beebe*, 732 F.3d 1030, 1052 (9th Cir. 2013) (internal quotation omitted). The first element "requires the effort that a reasonable person might be expected to deliver under his or her particular circumstances. Central to the analysis is whether the plaintiff was without any fault in pursuing his claim." *Id.* (internal quotation omitted). The second element requires a litigant to show that "extraordinary circumstances," including "external circumstances beyond [the litigant's] direct control," caused the "untimeliness and . . . ma[de] it impossible to file [the document] on time." *Id.* (quotations omitted).

The Ninth Circuit has held that "mental incompetence" will toll a statute of limitations when it "precludes a person from asserting his rights during the proper time period." *Brockamp v. United States*, 67 F.3d 260, 263 (9th Cir. 1995), *rev'd on other grounds by United States v. Brockamp*, 519 U.S. 347 (1996). A plaintiff must establish that the "mental impairment was an 'extraordinary circumstance' beyond his control by demonstrating the impairment was so severe

---

[5] At the hearing, Plaintiff argued that the CIS/Anarchy agreement was valid despite his disability because other people made that decision on his behalf and he just signed whatever documents they put in front of him. As the court explained above, a person is not legally incapacitated within the meaning of section 352(a) when they are able to handle their business and property with the assistance of other people. *See Est. of Stern*, 725 F. App'x at 522–23. Therefore, if Plaintiff was able to validly transact business through his agents, he was not legally incapacitated within the meaning of section 352.

that either (a) plaintiff was unable rationally or factually to personally understand the need to timely file, or (b) plaintiff's mental state rendered him unable personally to prepare a complaint and effectuate its filing." *Johnson v. Lucent Techs. Inc.*, 653 F.3d 1000, 1010 (9th Cir. 2011) (quotation omitted). The plaintiff must also "show diligence in pursuing the claims to the extent he could understand them, but that the mental impairment made it impossible to meet the filing deadline under the totality of the circumstances . . . ." *Id.* (quotation omitted).

In this case, the allegations in the FAC do not a support a finding of "extraordinary circumstances" that warrant the application of equitable tolling. As discussed above, the FAC contains almost no facts about Plaintiff's mental state covering the entire 12-year period of alleged mental incapacity between 2006 and 2018. Even if the court could consider the declarations and letters Plaintiff filed with his opposition and request to file a sur-reply, which it cannot, the statements in those documents fail to contain specific details about how Plaintiff's mental impairment made it impossible for him to timely bring his claims throughout that period. For example, Dr. Jackson wrote that Plaintiff "struggled heavily with concentration" and his "ability to understand and appreciate the consequences of his actions with regard to his decisions was significantly impaired." [Docket No. 43, Ex. 1 ¶ 9.] Without more, such statements are conclusory and provide no meaningful detail on how those symptoms affected Plaintiff's daily functioning for twelve years. Further, as explained above, Plaintiff's allegations with respect to his disability are inconsistent with other claims he makes, including that he was able to manage his affairs with the assistance of other people.

Finally, even though Plaintiff alleges that his disability ended in 2018, he did not bring this case until October 2020. Plaintiff's lack of diligence in bringing his claims after his disability ended weighs against applying an equitable remedy. For all of these reasons, Plaintiff's allegations are insufficient to support the inference that he "was unable rationally or factually to personally understand the need to timely file" or that his "mental state rendered him unable personally to prepare a complaint and effectuate its filing." *See Johnson*, 653 F.3d at 1010; *see also Scholar v. Pac. Bell*, 963 F.2d 264, 268 (9th Cir. 1992) (holding that equitable tolling is applicable in "extreme cases"); *Kiely v. Universal Music Grp.*, 2019 WL 9443183 (C.D. Cal. Dec.

16

12, 2019) (rejecting an equitable tolling argument in a copyright infringement case where the plaintiff was in a mental hospital for three years and took psychiatric medications).

It would be futile to allow Plaintiff to amend his complaint on the issue of equitable tolling. His allegations in the FAC are conclusory and inadequate to plead equitable tolling. They are also contradicted by other allegations. None of the additional assertions Plaintiff made in his opposition, improper sur-reply, or at the hearing would fix these deficiencies for the reasons explained above. Accordingly, it would be futile to allow Plaintiff to amend his complaint.

In sum, all of Plaintiff's state law claims were brought well outside the applicable statutes of limitation. He has not adequately pleaded facts that would support the application of either tolling under section 352(a) or equitable tolling. He has also not identified any further allegations he could make to render his tolling claims plausible. Accordingly, Plaintiff's state law claims are dismissed with prejudice.

### B. Federal Claims

Plaintiff also brings claims for federal trademark infringement and false designation of origin under the Lanham Act. These claims are based on Plaintiff's allegations that Defendants used terms that are similar to Plaintiff's trademarks and that these actions were taken with the "deliberate intent to cause confusion, mistake and deception among members of the relevant public and to trade on the goodwill associated with the Marks or create reverse confusion." *See* FAC ¶ 164. Defendants argue that Plaintiff's federal claims should be dismissed because they are barred by the 2008 Agreement in which Plaintiff explicitly released any claims against Facebook relating to Facebook's use of the Facebook trademarks. Mot. at 19-20; *See* 2008 Agreement §§ 3.1, 3.3.

Plaintiff opposes Defendants' position on several grounds. First, he argues that Defendants fraudulently induced him to sign the 2008 Agreement and so the release of claims contained in that Agreement is not valid. *See* Opp. at 19-20. This argument fails. The court ruled above that any claims for fraud or rescission related to the 2008 Agreement are barred by the relevant statutes of limitations. The court also determined that Plaintiff's claims were not tolled because of his alleged mental incapacity. Accordingly, Plaintiff cannot challenge the validity of

17

the 2008 Agreement based on fraud, coercion, or the other grounds raised in his complaint because such claims are untimely.

Second, Plaintiff argues that the court should not consider the 2008 Agreement on a motion to dismiss because he did not attach that document to the complaint. Opp. at 21. He asserts that the incorporation by reference doctrine does not apply because his claims do not "necessarily depend[]" on the document. *See* Opp. at 21 (quoting *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018)). This argument lacks merit because the court may consider documents extrinsic to the complaint on a motion to dismiss if those documents are "integral to the plaintiff's claims and their authenticity is not in dispute." *Birdsong v. AT & T Corp.*, No. 12-cv-6175 TEH, 2013 WL 1120783, at *2 (N.D. Cal. Mar. 18, 2013) (internal quotation marks omitted). Courts have held that release agreements that may bar a plaintiff's claims can be considered under the incorporation by reference doctrine. *See id.* (considering a release agreement on a motion to dismiss because it was "an integral part of [the plaintiff's] allegations, for she would have no valid claims unless the release agreement did not bar them"); *Advanced Cleanup Techs., Inc. v. BP Am. Inc.*, 2015 WL 13841820, at *2 n. 2 (C.D. Cal. Oct. 9, 2015) ("A well-established application of [the incorporation by reference] doctrine is a settlement agreement that, if valid, would bar claims alleged by the plaintiff in his or her complaint.") (citing cases); *see also Khoja*, 899 F.3d at 1003 ("[T]he incorporation-by-reference doctrine is designed to prevent artful pleading by plaintiffs . . . ."). Plaintiff does not dispute the authenticity of the 2008 Agreement but instead only argues that it is unenforceable. Because Plaintiff "would have no valid claims unless the release agreement did not bar them," the court may consider the 2008 Agreement on a motion to dismiss. *See Birdsong*, 2013 WL 1120783, at *2.

Third, Plaintiff argues that he was not a party to the 2008 Agreement because that Agreement was solely between CIS and Facebook. Opp. at 21. Plaintiff's argument is disingenuous. Elsewhere, in order to establish his standing to sue Defendants, he asserts that he was the sole owner, shareholder, and operator of CIS, and the successor in interest to all of CIS's assets. *See* Opp. at 2-3. Plaintiff's attempts to both rely on and disavow his relationship with CIS

18

to make his various arguments render his claims implausible. In any case, the 2008 Agreement explicitly applies not just to the parties (CIS and Facebook), but also "all of their officers, directors, employees, investors, shareholders, administrators, predecessors, successor[s], and assign[ees]." 2008 Agreement § 3.1. Plaintiff, as the sole owner and shareholder of CIS, is bound by the plain terms of the Agreement.[6]

Finally, Plaintiff represents that CIS sold all of its intellectual property rights, including any claims to "FACE" and the Faceparty marks, to Anarchy in March 2008. Plaintiff argues that therefore, CIS actually did not have any right to transfer those marks to Facebook in July 2008. *See* Opp. at 3. According to the documents Plaintiff submitted with his opposition,[7] CIS owned the marks until February/March 2008, when it transferred them to Anarchy. FAC ¶¶ 8, 83, 102(a); Bamforth Decl. ¶ 4 ("[A]n assignment agreement was fulfilled to transfer the intellectual property, including trademarks, from CIS to Anarchy on March 20, 2008 . . . ."); *id.*, Ex. 3 (agreement dated March 20, 2008). Plaintiff was the director and sole shareholder of both CIS and Anarchy and signed the March 2008 agreement on behalf of both companies. *See* Aldous Decl. ¶ 4 (confirming that Plaintiff was the director and sole shareholder of CIS and Anarchy); Bamforth Decl., Ex. 3 (agreement signed by Plaintiff on behalf of both CIS and Anarchy). According to Plaintiff, these documents evidence that CIS did not own the marks in July 2008 and therefore could not have transferred them to Facebook in the 2008 Agreement. Plaintiff's argument is not convincing. Even assuming that CIS validly transferred its rights in the marks to Anarchy, and therefore Facebook did not acquire such rights through the 2008 Agreement, the court determined above that the release of claims in the 2008 Agreement is valid as to Plaintiff. In other words, regardless

---

[6] At the hearing, Plaintiff argued that the Agreement does not apply to him as an officer of CIS because the language relating to officers and directors appears only in section 3.1 of the Agreement (which releases CIS's claims to any rights in the Facebook trademarks) and not in section 3.3 (which contains the general release under California Civil Code § 1542). Plaintiff's argument fails for two reasons. First, Plaintiff does not explain why section 3.1 on its own would not bar his claims on this case, apart from the general release. Second, the Agreement cannot reasonably be read to apply only the specific release, and not the general release, to the parties' officers and directors simply because the language relating to officers was not explicitly duplicated in the general release paragraph that appears just below the specific release.

[7] The court considers these documents only to assess whether there is any possibility that Plaintiff can amend his complaint to address the deficiencies identified in this order.

of whether Facebook actually owns the trademarks now, Plaintiff has no legal right to sue Facebook "relating in any way to its use of the FACEBOOK or the FACE Marks." *See* 2008 Agreement § 3.1.

For all of these reasons, Plaintiff has not raised any compelling reasons why the court should not consider the 2008 Agreement or why the release in that Agreement does not apply to Plaintiff's claims in this case. The court therefore finds that the plain terms of the Agreement bar Plaintiff's federal trademark claims against Facebook. Any grounds Plaintiff may have had to rescind the Agreement are no longer applicable because Plaintiff's fraud-based claims as well as the claim for rescission are time-barred. The federal claims are accordingly dismissed. Since Plaintiff has not identified any other allegations he could make to address the deficiencies identified above, the federal trademark claims are dismissed with prejudice.

## V. CONCLUSION

For the reasons stated above, Plaintiff's claims are dismissed with prejudice. The Clerk shall close this case.

**IT IS SO ORDERED.**

Dated: September 10, 2021



Judge Donna M. Ryu
United States Magistrate Judge